STATE *v.* CHARLES DOHERTY.

May Term, 1900.

Present: TAFT, C. J., ROWELL, TYLER, MUNSON, START AND THOMPSON, JJ.

Opinion filed August 29, 1900.

*Criminal law—Evidence to show preparation—Evidence of premeditation when the crime charged is murder*—In a trial for murder in which the evidence of the State tended to show that the respondent shot and killed the

deceased with a revolver, evidence that, the night before the shooting, the respondent purchased the revolver with which he shot, tended to show preparation and premeditation and was admissible.

*Evidence of unconnected fact*—Evidence that about five months before the shooting in question the respondent had a worthless and unserviceable revolver which he threw away had no tendency to qualify or explain the purchase by the respondent the night before the shooting was done, of the revolver with which he shot the deceased.

*Evidence—Remote fact*—Assuming, however, that evidence of the possession by the respondent, five months before the homicide with which he was charged, of a rusty and unserviceable revolver which he threw away, would have a remote tendency to qualify or explain the purchase by the respondent of a revolver the night before the shooting in question, such evidence was properly excluded on the ground of remoteness.

*Evidence—Ruling as to remoteness not ordinarily revisable*—Moreover, the ruling of the trial court upon the question of the remoteness of offered evidence is ordinarily not revisable in the Supreme Court.

*Evidence—Offer must show relevancy*—In support of the claim that a revolver was purchased by the respondent for the purpose of self-protection, an offer to show threats against him by a third person is not relevant, unless it appears from the offer that the threats were made before the purchase of the revolver.

*Immaterial evidence not entitled to corroboration*—A respondent does not by introducing immaterial evidence acquire the right to corroborate it by further immaterial evidence.

*Submission of hypothetical question to opposing counsel*—Counsel have no legal right to have a hypothetical question submitted to them for examination before it is put. The matter of stating a question to the court out of the hearing of the jury is referred to by way of illustration.

*Lack of opportunity to examine hypothetical question—No disadvantage unless objection could have been made which was not*—Lack of opportunity to examine a hypothetical question before it was put cannot be considered to have worked any disadvantage to the party complaining of such lack of opportunity, unless he can show in the Supreme Court that some tenable objection to the question might have been made which was not made.

*Exceptions to questions and answers without discussion—Progress of trial promoted—Rights of excepting party to be protected*—While no question can be made in the Supreme Court that was not raised below, an exception can be taken to any part of a question or to the testimony contained in the answer, and if the exception is a valid one, the right of

the party can thereby be maintained. Any other practice would tend to retard the progress of a trial.

*Expert testimony—Scope of hypothetical question—Weight of testimony distinguished from admissibility*—The opinion of an expert witness based on a portion of the case is admissible. The range of the facts in evidence to which it relates affects the weight of the testimony elicited rather than its admissibility.

*Homicide—Time for premeditated determination to kill*—The evidence of the State tended to show that the respondent went into a barn and then left the same and walked smartly a distance of some fifteen or twenty feet, when he shot the deceased. There was time, in the circumstances which the evidence tended to show, for forming the premeditated determination to kill after the respondent left the barn.

*Homicide—Respondent a witness—Failure to deny intent to kill just before the homicide*—That the respondent, who as witness in his own behalf testified that he had no intent to kill when he went into the barn, nor while he was in the barn, did not testify that he had no such intent when he went out of the barn, was a circumstance for the jury to consider in determining the question of the respondent's guilt, and the degree of his crime if they found him guilty.

*Homicide—Fear, fright, nervousness and cowardice*—Fear, fright, nervousness and cowardice on the part of a slayer, bear the same relation to the homicide as do anger and heat of blood.

*When fear, fright, nervousness and cowardice are consistent with murder*—If fear, fright, nervousness or cowardice on the part of a slayer are without such provocation as the law regards as sufficient justification for anger and heat of blood, a homicide, which independently of these conditions is murder, is not thereby rendered manslaughter or justifiable homicide.

*When fear, fright, nervousness or cowardice render a homicide manslaughter*—If, in an encounter with another, one draws a revolver and fatally shoots his antagonist, and the drawing and use of the revolver is an afterthought, subsequent to the encounter, and is wholly due to then present nervousness, fear, anger, or cowardice, the killing is manslaughter, unless it is justifiable homicide.

*Homicide in self-defense—Justifiable homicide—Bearing of fear, fright, nervousness and cowardice*—If one sees another coming towards him in a hostile attitude, and the circumstances are such as to reasonably lead him to believe that he is in danger of being killed or of great bodily harm, and he so believes, and through nervousness, fear, fright or cowardice fatally shoots his assailant, it reasonably appearing to him that he can

defend himself in no other way, the homicide is justifiable as in self-defense.

*The charge—Respondent given full benefit of claim that shooting was caused by fear, fright, nervousness and cowardice*—The evidence in this case called for a charge, which was given, relative to murder in both degrees, to manslaughter and to justifiable homicide, and the aspects of-the case favorable to the respondent, growing out of testimony in relation to fear, fright, nervousness and cowardice, were fairly presented in appropriate portions of the charge reviewed in the opinion.

*Mutual combat—First blow—Charge favorable to the respondent*—In the circumstances of this case which the evidence tended to show, an instruction that in a case of homicide in mutual combat, the question of which party gave the first blow is not important to the character of the homicide, was favorable to the respondent.

*Mutual combat— Use of illustration as to what would constitute murder*—Circumstances which the evidence tended to show made it appropriate for the court, in considering an agreement for a mutual combat, to say to the jury by way of illustration, that if a man draw his sword before the other has attempted to draw his and thrust his antagonist through the body whereby he dies, it is murder, for it shows the purpose of killing in the first instance.

*Illustration—Not to be inferred that illustration covers entire case*—From the use of this illustration the jury had no right to understand that elements not involved in the illustration were excluded from their consideration if they found such elements to exist.

*Instruction not applicable to any evidence need not be given—Abstract questions*— An instruction, relative to a case in which one of the parties to a mutual combat gives notice of his desire to withdraw from the combat and endeavors to decline any further struggle, was not required by any evidence in this case.

*Mutual combat—Murderous intent at outset—Change of intent after affray begun*— In an instruction which stated the law applicable to the case, if the jury found that the respondent entered upon the affray with murderous intent, the respondent was fully protected when the instruction permitted the jury to consider whether his design was altered during the affray before the homicide, and to determine the character of the homicide, in accordance with such altered design.

*Question of superior strength in  connection with use of revolver*—It was not error not to refer to the question of the superior strength and  health of the one, and of disease and weakness of the other, in that part of the charge which referred to the use of a revolver by the respondent.

*Charge—References to testimony fairly made—Questions of fact left to the jury—*
      A full review of the charge shows that the references to the testimony
      were fairly made, and that all questions of fact were left to the jury.
*New trial—Newly discovered evidence of insanity—Evidence must generate a*
      *doubt of guilt—*A petition for a new trial, brought by the respondent,
      on the ground of newly discovered evidence of insanity, was dismissed
      for the reason that the evidence in its support, taken in connection
      with the rest of the testimony, was not calculated to generate in the
      minds of a jury a reasonable doubt of the respondent's guilt.
*Defense of insanity—Measure and burden of proof—*The doctrine is recognized
      that a reasonable doubt of guilt, produced in the minds of the jury by
      evidence of insanity, entitles the respondent to acquittal.

INDICTMENT for murder in two counts. Trial by jury, Washington County, September Term, 1899, *Watson,* J., presiding. Verdict, guilty of murder in the first degree. The respondent excepted. Cause passed to the Supreme Court before judgment and sentence.

The evidence introduced on the part of the State, tended to show that one, Frederick Murphy, and the respondent, at the time of the shooting referred to, and for some time previous, were workmen on the Bolton Falls dam, and were boarders at the house of one, J. E. Pixley, in Waterbury, in the County of Washington; that ill blood had arisen between Murphy and the respondent; that the respondent had made threats concerning Murphy and that, a few days previous to the shooting in question, there was trouble and sharp words over a newspaper in connection with Murphy's going to the room of the respondent after it. The evidence of the State further tended to show that on the night previous to the shooting, the respondent went to Waterbury and purchased a thirty-two calibre revolver and a box of cartridges, and that on the night of the shooting, the respondent and Murphy came up towards the house of the said Pixley, nearly together, and that as they reached the house the respondent said to Murphy, in effect, "We may as well settle this difference, now as any other time," and that in reply, Murphy said, "All

right ," that thereupon the respondent said, "Come into the barn," and started towards the barn, and that Murphy took off his coat and sweater and started towards the barn. Testimony introduced on the part of the respondent tended to show that Murphy first sug. gested settling the difference by saying just before they reached the house, as before mentioned, "We might as well settle this difference," and that the remark of the respondent above stated was in response to this. While there was some dispute as to who first suggested a settlement, it appeared from the evidence that the respondent and Murphy, then and there, in effect, agreed to settle the difficulty between them in mutual combat.

The State having been permitted to show, upon the question of premeditation, that the respondent purchased a revolver on the night before he shot Murphy, and the claim of the defense being that the revolver was got simply as a proper precaution, under all the circumstances surrounding the respondent, and with no purpose to use it on Murphy or any one else, except in proper protection of life and limb, and the respondent, having testified to that effect, and that he had a revolver about five months before, but that, it being worthless, he had thrown it away, the defense offered to show by one Burnham, that the respondent had had a revolver as he had testified. The testimony offered was excluded on the ground of remoteness. This evidence was offered in cor- roboration of the respondent's testimony that he had had a revolver about five months before, and also to show that it was nothing new for him to have one, under the claim that it bore on the question of premeditation. It appeared that this revolver was an old and rusty one, and that the respondent threw it away the fall before the shooting in question. No claim was made that the respondent had any revolver at a later time, until he bought the one with which he killed Murphy.

The respondent was permitted to give evidence tending to show that, on the morning of the day preceding the shooting, and before the purchase of the revolver, he had been told that Murphy and a certain colored man had made a plot to "fix" the

respondent. There was, however, no evidence of such plot. The defense claimed that the purchase of the revolver was a precautionary measure on the respondent's part to protect himself against assault by Murphy and the colored man, or by any one else, and offered to show threats of the colored man to "lick" the respondent. The offer did not indicate when the claimed threats were made and the evidence thus offered was excluded.

It appeared that when Murphy and the respondent agreed to settle the difficulties between them in mutual combat, as above recited, they were at or near the veranda of the house of the said Pixley, and that there was a barn some thirty feet away, and the evidence on the part of the State tended to show that, when the respondent went toward the barn, as stated, he went with a quick walk, and went into the door of the barn; that Murphy, after he had taken off his coat and sweater, walked quite slowly towards the barn; that the respondent, as he went into the barn, stepped back of a door that was closed, turned and faced out to see if Murphy was coming, and put his hand into his hip pocket and drew a revolver up in sight from his hip pocket; that the boarding-house keeper, Pixley, seeing this, spoke to Murphy and said, "Fred, what is the trouble here?" that Murphy answered, "Oh, not much," and that Pixley then said to Murphy, "Stop, don't go in there; you will get hurt;" that thereupon Murphy stopped and turned his head to the right, and that as he did so, the respondent came out of the barn quite smartly, went up to Murphy and raised from his hip pocket a revolver, that Murphy then swung to the right and ducked his head very low; and that as he did so, the respondent lowered the hand which held the revolver and fired; that when the shot was fired, the two men were near enough together to reach each other with their hands; that when the respondent fired, he said to Murphy, "I have got you now," or something to that effect; that Murphy was not armed with any dangerous weapon and did not know that the respondent was; that when the shooting took

place Murphy was nearer to the house veranda than he was to the barn, which was about thirty feet from the veranda.

The respondent's evidence tended to show that he had not been well for a time, though able to work; that he was not as large, healthy or strong as Murphy; that he went to the barn for safety, because he was scared when he saw Murphy commence to take off his garments; that he was in the barn a few seconds, and that then seeing Murphy coming towards the barn he came out of the barn, and was then so scared and nervous that he shot Murphy. The evidence of the State tended to show that the respondent was not scared, nor nervous, and that some days before the shooting the respondent said that " he thought he could lick Murphy yet;" that "Murphy was no good," and that "he had no sand in him." It appeared that Murphy was shot on the 18th day of February, 1899, and that he died in a hospital at Burlington, April 1st, 1899. The evidence of the State tended to show that he died in consequence of the shot fired by the respondent.

Dr. John B. Wheeler, who was a physician in charge of Murphy at the hospital in Burlington, testified in behalf of the State as to the facts within his own knowledge, and also as a medical expert. After stating his observation of Murphy and his medical treatment of him, and the results of his autopsy upon the body of Murphy after his death, he gave the following testimony:

Q. "Well, Doctor, assume that this person, on whom you performed the autopsy on the 1st day of April, on the 18th day of February was shot in the left side, at the point where the external wound appeared, with a bullet, 32-calibre bullet, and that the wound, which you have described, was made by that, taking that into consideration, taking into consideration your observation during your care of the dead man, taking into consideration the results of your observation at the autopsy that you have testified to, what, in your opinion, was the cause of the death of Fred Murphy ?

A. I think the cause of his death, or my opinion is that the cause of his death was septic poisoning, the result of the bullet wound.

Q. Was this a natural result of the wound?

A. Yes.

Q. Assume, Doctor, if you please, that this person received, on the 18th of February, a bullet wound, caused by a 32-calibre bullet, and that the wound you discovered was the result of that shot inflicted at that time, take into consideration the observation which you had of him, during your care of him, as you have testified to-day, take into consideration what you observed at the autopsy, as you have testified to-day, what do you say as to whether there was any other cause which contributed to the death of Fred Murphy, except such as would naturally follow from the bullet wound so inflicted on the 18th of February?

A. I say there was no other cause."

This testimony was seasonably objected to.

The charge of the court related to murder in the first degree, to murder in the second degree, to manslaughter and to justifiable homicide. Exceptions were taken to the charge, which, together with the portions of the charge excepted to, sufficiently appear from the opinion.

A petition for a new trial, on the ground of newly discovered evidence, was heard in connection with the hearing on the exceptions.

*Richard A. Hoar,* State's Attorney, for the State.

*Frank Plumley* and *Edward H. Deavitt* for the respondent.

TAFT, C. J. I. Testimony was introduced upon the part of the State tending to show that the respondent, the night before the homicide, went to Waterbury and purchased a revolver and cartridges as tending to show the homicide was premeditated. This was legitimate testimony, for any fact "which constitutes a preparation for an act" is relevant, Steph. Dig. of Ev. (2nd

Am. Ed.) 19, and tends to show premeditation. The respondent testified he bought the revolver and cartridges to defend himself in proper protection of life and limb; that when he went on the job in the fall of 1898, five months before, he had a worthless revolver which he threw away some time thereafter. The respondent offered to show by one Burnham that he, the respondent, had a revolver when he went on the job the fall before, to corroborate his own testimony and to show that it was nothing new for him to have one, as bearing on the question of premeditation. It was not proper to corroborate his testimony, for, having a worthless revolver without cartridges five months before was not relevant to his having procured a new serviceable one with cartridges the day before the homicide. No more so than to show he had a battle-axe or scimitar. His testimony in that respect being immaterial, corroboration of it was properly denied. The fact that he had a worthless revolver which he threw away, did not tend to show it " was nothing new for him to have one " and for that purpose it was legitimately excluded. Had the testimony the tendency claimed for it by the respondent, the court excluded it upon the ground that it was too remote from the transaction. Questions of remoteness in such instances will not ordinarily be revised but left to the trial court. *Dover* v. *Winchester*, 70 Vt. 418; Steph. Dig. of Ev. (2nd Am. Ed.) 6. There is no occasion to revise the question of remoteness in this case.

II. The prosecution claimed that the respondent purchased the revolver with the intent to use it upon Murphy. The respondent testified he purchased it as "a precautionary measure to protect himself against assault by Murphy and the colored man, or of anyone else." There was a colored man at work upon the job with Murphy and the respondent.

The respondent, for the purpose of showing that he did not buy the revolver particularly for Murphy, but for the general purpose of self-protection against the colored man as well as against Murphy and others, offered testimony which was ex-

cluded under exception, tending to show that the colored man had told the respondent that he (the colored man) would lick the respondent. This was offered as bearing upon the intent with which he purchased the pistol.

There was no offer to show the time when the threat of the colored man to lick him was made. It was relevant, if at all, only if made before the purchase of the revolver, and as there was no offer to show that it was before, there was no error in rejecting the testimony. Whether relevant or not we do not decide.

III. Two exceptions were taken to the testimony of Dr. Wheeler, a surgeon, who testified as a medical expert. The question put to him was an hypothetical one. He was directed to assume certain facts, which the testimony tended to show, and to consider such facts as were disclosed by the autopsy, which he himself had made, and also his observations at the autopsy, to all which he had testified, and was asked what in his opinion caused Murphy's death. His answer was, septic poisoning, the result of the wound.

A similar hypothetical question, if there was any other cause which contributed to his death, was put, and he answered in the negative. (a) One objection made to the last question was that, "It had not been submitted to the respondent's counsel for consideration before it was asked." The counsel contended they should have had an opportunity to examine the question in order to ascertain whether there were other objections to be urged against it. It does not appear from the record that there was any other objection than the one taken, hereinafter noted, nor that any other objection can now be made. Unless it is shown that there was an objection to the question that could have been taken, had the counsel had the opportunity to have inspected it, the respondent was not harmed by the denial of the claimed right to consider the question before it was asked. For this reason there was no error. But counsel have no legal right to examine a question before it is put. The party loses nothing

by such a rule, for while no question can be made in this court that was not raised below, exception can be taken to any part of a question, or of the testimony contained in the answer, and if the exception is a valid one, the right of the party can thus be maintained.

Any other practice would tend to retard the progress of the trial, for much time might be spent over a question and the witness answer he knew nothing on the subject.    Questions are often stated to the court, so that the jury cannot hear them, and it is generally required in case the defendant's counsel ask that it be so done.    But it is not a legal right, denial of which is error.  (b)  The objection made to both questions was that they did not involve all the facts in the case and were lacking a portion of its clinical history.    This was not a valid objection to the questions nor the answers.    The opinion of an expert witness may be taken based upon a portion of the testimony in a case. The more testimony embraced in an hypothetical question the more valuable the testimony may be, depending upon the circumstances.      But the testimony is legitimate based upon part of it.    The cases often cited upon this point are :  *Gilman* v. *Strafford,* 50 Vt. 723; *State* v. *Hayden,* 51 Vt. 296; *State* v. *Woodbury,* 67 Vt. 602.  In *Gilman* v. *Strafford* the question did not arise, *State* v. *Hayden* was decided upon the authority of the Gilman case, and in *State* v. *Woodbury* the question was correctly decided without the citation of authority.

IV.    Many exceptions were taken to the charge and have been argued by counsel.    The respondent insists there was error in respect to what the court said upon the subject of the respondent's testimony in regard to his intention of shooting Murphy. In that part of the charge relating to murder in the first degree, the court properly charged with reference to the intention of the respondent in regard to the homicide of Murphy and called the attention of the jurors to the fact that the respondent had testified he had no intent to kill Murphy before he went to the barn, and that he had no such intent when he was in the barn ; that he had

testified to that, but had said nothing with reference to what intent he had after he went out of the barn. The jurors were told that if he had no intent to kill Murphy before he went out of the barn, there was time for him to form that determination between that time and the time of the shooting. And that if he did so form it after he went out of the barn that it was, within the meaning of the law, premeditated.

. It is insisted that the jury should have been told in this connection what the claim of the respondent was in respect to his intention after he had gone out of the barn. There was no error in the charge so far as the court went in disposing of that question when speaking of the homicide in respect to whether it was murder in the first degree or not. And what the counsel insist should have been said to the jury at this time, was stated to the jury distinctly and accurately in that part of the charge in which it was material in respect to reducing the crime to manslaughter, whether it was premeditated or not, and whether he did form an intent after he went out of the barn to shoot him. They were told to consider all the evidence in respect to it in determining that question, and the jury were told that they must take into consideration all that the respondent said which bore upon his intention in regard to the shooting of Murphy, and that they should take it as they remembered it, and not as the court stated it to them, so that the respondent had the full benefit of the instruction in respect to premeditation when the court charged upon the subject of manslaughter. The jury were told that if the shooting of Murphy was the result of the fear, fright, nervousness, or terror that seized the respondent, after he went out of the barn, it was manslaughter and not murder.

What the judge said was by way of comment in respect to a feature of the case which, if true, was quite significant. The question was with what intent did the respondent shoot Murphy. He went on the stand as a witness, and in response to questions of his counsel, said he had no intent to shoot Murphy when he went into the barn, nor when he was in the barn, but did not

testify what his intent was when he did go out of the barn. His failure to testify upon this point was a circumstance for the jury to consider, for if he had no intent to shoot him when he went out of the barn, it would have been very natural for him to have followed his denial of an intent to shoot him when he went into the barn, and when he was in the barn—with a like denial of an intent when he went out, and until the time of the shooting. From his failure to do so, the jury might properly infer he went out of the barn with the intent to shoot him. It is true his testimony tended to show that after he went out of the barn he was so frightened that he then shot him, but he did not say he had no such intent after he went out of the barn and prior to the shooting, although it might be inferred from what he did say. It was an argumentative way of stating that until he shot, when overcome with fear, he had no intent to kill Murphy. It is argued that as "the court gave an explanation of the respondent's evidence unfavorable to him, the court should also have given an explanation favorable to the respondent." This is not a just criticism of the charge. The court did not state the testimony in detail in any respect. The jury were told to consider the previous conduct of the respondent and Murphy toward each other, without stating what that conduct was, also what was said by the respondent to Murphy about settling the matter, or if Murphy spoke first, what was said about it,—the manner in which each conducted himself, etc. The jury were told that the presumption was that the killing was without malice, and that that presumption, with the general presumption of innocence, was to be weighed in the respondent's favor and must be overcome by the evidence of the State, and the killing must not be the result of some sudden heat of passion, etc. Upon this question of premeditation the court made no reference to the damaging character of the testimony of the respondent, save to the fact that he had not testified what his intent was when he went out of the barn, and this, we have said, was proper.

His claim was that he had no intent to shoot until he was so overcome with fear and terror that he feared immediate great bodily harm, etc., but the court made no reference in its charge to the most damaging features of the testimony, e. g., his statement to Murphy the day of the shooting that he (Murphy) had better try to do him, if he thought he could, thus placing the symbolical chip upon his shoulder and daring Murphy to knock it off; that "he would fire Murphy down stairs if he caught him in his room again"—that "he thought he could lick Murphy yet"—that "Murphy was no good", and that "he had no sand in him", that he met Murphy more than half way between the barn and the house and that when he shot him he said "I have got you now"; all this when the respondent was armed and Murphy was not—testimony that hardly tended to support the respondent's theory that he was in great fear of Murphy— still none of this testimony was called specifically to the attention of the jury by the court. The explanation of the testimony by the court was as favorable to the respondent as unfavorable, and this exception of the respondent is not sustained.

It is further claimed that the court did not give due consideration to the testimony showing fright, fear, nervousness and cowardice. The charge on the subject of manslaughter was full and accurate and the court said to the jury that if the drawing of the revolver and the use of it was an afterthought subsequent to the encounter, wholly due to the then nervous excitement, fear, anger and heat of blood of the respondent, the case would be one of manslaughter and not of murder, unless justifiable, in self-defense. But if such elements were without such provocation as the law regards as sufficient justification for anger and heat of blood, the killing would be murder and not manslaughter. That is, the charge placed the elements of fear, fright, nervousness and cowardice on the same plane with anger and heat of blood. There is no other rule, and we fail to see wherein the trial judge erred in respect to the rule as applicable to a case of sudden fright, fear, terror and nervousness. The jury were

plainly told that if the drawing and use of the revolver was an afterthought subsequent to the encounter and wholly due to the then nervousness, excitement, fear, anger and heat of blood of the respondent, the offense was manslaughter and not murder. If, as the respondent's testimony tended to show, he went into the barn for safety, thinking Murphy would go away, when he saw Murphy removing his outer garments and start towards him and he judged from his (Murphy's) hostile attitude that he intended him, the respondent, great bodily harm, and he then through fear, nervousness, excitement, fright, etc., shot Murphy, it reasonably appearing that it seemed to him he could defend himself in no other way, the circumstances would present a case of justifiable homicide, one of self-defense. It is argued that when the respondent saw Murphy going towards him, and apprehending he would do him great bodily harm, he was seized with fear, terror, excitement, fright and nervousness and that he then shot Murphy. Such facts presented a case of self-defense and required appropriate instructions upon that subject, and it will be seen by reference to the charge that the instructions were full, adequate and complete in that respect, and of such a character, that of them, the respondent does not complain. It is claimed by the respondent that he had no design to kill Murphy, but that when he went out of the barn he was confronted by the deceased and so overcome with fear, nervousness, fright and terror that as a result he shot Murphy in self-defense, and the counsel argue that on this theory the respondent had a right to do what was necessary to make his defense effective, and although it might not have been necessary to have killed Murphy, if in view of his fear, fright, nervousness or cowardice, it reasonably seemed so to him, he could not be convicted of murder. Many cases were cited upon this question, namely: *State* v. *Carr*, 58 Vt. 483; *Grainger* v. *The State*, 5 Yerg. (Tenn) 459, and many citations from the text-books. The gist of the rule in respect to this matter is well stated in all of the cases so far as we observe. It is not whether the necessity actu-

ally existed, but whether in fact it reasonably seemed so to the respondent, under all the circumstances of the case, and the rule was properly stated by the trial judge in the respect mentioned, for the court said that "If the circumstances were such as reasonably to lead the respondent to think that he was in danger of being killed or of great bodily harm by an assault from Murphy, he had a right to defend himself, etc." And later the jury were told that "the amount of force that he (the respondent) had a right to use depended to some extent upon the peril that he had reason to believe he was in at the time. * * * * He had to judge of the danger he was in from the circumstances that surrounded him, and if it reasonably appeared to him under all the circumstances that he could protect himself in no other way except by killing Murphy, and if then Murphy started to kill him or do him great bodily harm, he would have a right to defend himself under the circumstances in that way." This question was stated accurately and fully by the trial judge and the claimed error is that the jury were not told that the crime of manslaughter was distinct from murder so that the jury might have understood that if the defendant was in fault at all in acting unreasonably under the circumstances, the jury should find him guilty of murder when they should properly find him guilty of manslaughter only, and that this injustice arose from the failure of the court to state the question consistently with the theory of manslaughter,—the lesser crime. But the theory of the case as claimed by the respondent in respect to manslaughter had already been fully stated by the trial judge, and it is not probable the jury could get a wrong conception of the rules in respect to the several degrees of crime when they were so accurately and fairly stated by the court. The respondent had the benefit of having the testimony considered under a full knowledge of the law as to the essential characteristics of each kind and degree of crime with which the respondent was charged under the indictment. The court did not state that the respondent could not be convicted of manslaughter nor of anything less than murder. This

assumption of what the court stated is not correct. The court left the jury to consider whether the offense was murder in the first or second degree, manslaughter, or justifiable homicide. The fact is, these questions were all presented to the jury and the question of self-defense was fully and fairly stated to them. Two full pages of the printed case contain nothing but the instructions in regard to whether the homicide was justifiable, whether the killing was in self-defense, and so far as we can see, it accurately, fairly and fully met every phase of the case. The criticisms óf counsel taken in their brief in respect to the charge, place it almost wholly upon the ground that the jury might have misunderstood facts in reference to the transaction and the law as applicable thereto. For instance, it is argued that from the language of the charge, the jury might well understand that the respondent was not justified under any circumstances in going out of the barn. It is clear that one is not warranted in taking this view of the case. No jury could have that impression from the whole of the charge nor from any part of it. They were at liberty to find from the language of the instructions that if the respondent was at fault in coming out of the barn, but that the shooting resulted from fear, fright, terror and nervousness, or his seeming situation as it reasonably appeared to him at the time, he was not guilty of murder, in either degree, and it is fair to say that the jury must have followed these instructions. The instruction given the jury in respect to the offense, if the affray was entered upon by the respondent under such circumstances that the killing would be murder, fully protected him in respect to any change in his situation during the affray, by permitting the jury to determine that if his design in respect to the affray altered, it became merely a case of manslaughter or self-defense ; the respondent had the benefit of it and the court did not err in that respect. The court charged that, " Though the right to take life in self-defense is unquestionable, one on whom another unarmed is making mere threats and going towards in his ordinary manner of walking must not instantly shoot him, and if he

does thus needlessly kill the other who, unarmed, is only making threats and thus *going* towards him, it would be murder." Claim is not made that this is an erroneous instruction, but it is insisted that the jury should have had an opportunity to judge for themselves whether the acts of Murphy amounted to an overt act or hostile demonstration. The court did not take from the jury the right to determine the nature and character of the acts of Murphy, whether overt or not, nor did the court state that there was no overt act of injuring the respondent on the part of Murphy, for in one part of the charge the court stated the case saying that, "If the jury find that Murphy went along behind in his usual way of walking without any overt act of injuring the respondent, excepting taking off his coat and going towards the barn, and that when about half way between the house and barn he did or did not stop when spoken to by Mr. Pixley, and told not to go into the barn for he would get hurt, the respondent would have no right to rush out of the barn revolver in hand, draw near to Murphy and then and there kill him, unless the circumstances were such as to reasonably lead the respondent to think that Murphy was about to kill him or do him great bodily harm and that the respondent could protect himself in no other way." The statement of this rule was correct and such as required by the testimony in the case. There is no statement on the part of the court that there was no overt act on the part of Murphy to injure the respondent. Whether there was any overt act on the part of Murphy to injure the respondent was expressly left to the jury. This is shown by the following abstract from the charge.

"It is claimed on behalf of the respondent that the taking off his coat by Murphy and going toward the respondent at the barn, as the evidence tends to show, was such an overt act as to create in the mind of the respondent an hostile demonstration by Murphy of such a character as to impress upon him the imminence of danger of loss of his life or of great bodily harm. You will take into consideration all the evidence bearing thereon, and

say whether what Murphy then and there did was such an overt act as to reasonably impress the respondent in that way, and if it was, you will consider such threats as evidence bearing upon the question of self-defense, and give the evidence such weight as you deem it entitled to. But if you find that what Murphy then did was not such an overt act, then such prior threats made by Murphy would have no force in favor of the respondent in support of his plea of self-defense."

That the question of overt acts on the part of Murphy was left to the jury is also seen from the very close of the charge—the last thing said to them, viz:

"In referring to what took place when the respondent and Murphy went on the piazza, and in substance, agreeing to go out and settle the matter, or had a talk about it, I stated one or both of them took off their coat or outside jacket. It is suggested that the evidence tends to show that Murphy took off a coat and sweater. Well, you will remember the evidence, gentlemen, and in that regard you will take it as you remember it. And you will take into consideration, at the same time, the actions of Murphy, so far as they were perceptible to—seen by the respondent, in determining whether there was an overt act within the definition that I have given you, a demonstration of that nature on the part of Murphy toward the respondent."

The testimony tended to show that Murphy took off his coat and sweater and started towards the barn after he and the respondent had agreed to settle the difficulty between them by fighting, and the court stated all the facts in reference to Murphy's conduct which the testimony tended to show. The claim that the jury should have been told that " if the assaulting parties talked together before the homicide was commenced and one gave notice of his desire to withdraw from the combat, and really and in good faith endeavored to decline any further struggle and the homicide was necessary to save him from great bodily harm, it might be excusable," was not required under the state of the testimony for there was nothing in the testimony

that indicated or tended to show any desire on the part of the respondent to withdraw from the combat and that he had really and in good faith declined any further struggle, but the testimony tended to show the reverse. It was an abstract question and the court was not required to give any instructions upon it.

There are two further objections made to the charge: one is to the language in regard to the case of mutual combat, when the court said : "That it was not important to the character of the killing in cases of mutual combat which party gives the first blow." This was favorable to the respondent inasmuch as it gave the jury liberty to acquit him although he gave the first blow ; and the court had a right to state the rule that if a man draw his sword before the other has attempted to draw his and thrust his antagonist through the body, whereby he dies, it is murder, for it shows the purpose of killing in the first instance. This instruction was peculiarly proper. The testimony tended to show that Murphy was unarmed, that the respondent was armed, and it is evident that the respondent knew that Murphy was not armed, that they had agreed to go to the barn or the vicinity and settle the matter, as they phrased it, in an encounter. This being so and before they had any opportunity to engage in mutual combat without anything on the part of the respondent to show that he intended to retire from the combat, if he with his fire-arm, knowing that Murphy had none, shot him through the body whereby he died, it was murder for it showed the purpose of killing in the first instance. This instruction was required, and although there might have been in the case other elements which characterized the shooting, the jury had no right to understand that these other elements had nothing to do with the degree of criminality of the shooting. The jury may have found there were no other elements in regard to it, but simply the fact that the respondent armed himself, knowing that the deceased was unarmed, and then at the very first point of the encounter shot him. This would require the instruction

26

given. Neither was it error not to state the questions of superior strength and health of one and disease and weakness of the other in that part of the charge which referred to the use of the revolver by the respondent. There were no instructions given to the jury in regard to the testimony which were erroneous. The testimony in the case required full and accurate instructions in regard to the character of all degrees of the crime,—murder of both degrees, manslaughter, and justifiable homicide, and the court fully complied with all these requirements, and we are unable to find error in any part of the charge.

Upon inspection of the record the court are of opinion that judgment ought to be rendered upon the verdict, and it is so rendered and sentence and execution thereof ordered.

V. The respondent has brought a petition for a new trial upon the ground that since the former trial he has discovered testimony to show that he was not guilty by reason of insanity. He supports his petition by the depositions of nine witnesses, who appear to be reputable persons, many of them town officers, residing in South Berwick, Maine, and that vicinity. The substance of all the depositions is that the respondent was odd, peculiar, not talkative,—that at times he would be suspicious, imagining there were parties ready, as one witness phrased it, " to do him up," morose, and sullen, but was not vicious, while at other times he would be talkative, companionable, genial and cheerful. Testimony tends to show that at times he was somewhat troubled from having become a Congregationalist, or attended the Congregational church when he was formerly a Catholic. The testimony tends to show that he complained of having been wrongfully listed in South Berwick, but at the time he made the complaints in respect thereto, he was drunk and there is nothing in the testimony tending to show that he was not wrongfully listed there. One witness says that he would only say " Hello " when persons spoke to him. This is the substance of the testimony which it is claimed has been newly discovered. One witness says that he was satisfied in his own mind that the respondent

was not right mentally; another one, that he thinks the respondent must have been insane to shoot anyone, while two pronounce him insane in their opinion. One says that he is not capable of judging whether Doherty was sane or insane ; one says that he cannot call him insane and three of the witnesses state that the thought that he was insane never occurred to them at the time when they were noticing his oddities and peculiarities.

It is hardly necessary to speak of the question whether the respondent or his counsel were in fault or negligent in not making the discovery of this testimony before the trial, for the reason that the testimony taken as a whole does not convince us that a different result would be reached upon a new trial. We have scanned it very carefully. We do not require it to be of such a character that it would convince a jury, by any rule of evidence, that the respondent was insane. But it must be of sufficient force taken in connection with all the rest of the testimony in the case to generate or create a doubt in the mind of the jurors of the party's guilt. The burden is not upon him to establish his insanity, but if the testimony that it is claimed has been newly discovered is of such a character as to leave a reasonable doubt of the respondent's guilt when taken in connection with all the rest of the testimony, it would be sufficient and we should grant him a new trial. But the character of it is such that we do not take this view of it and are of opinion that in case of another trial the result would be the same as the last.

*The petition is therefore dismissed.*