NAPIER v. GREENZWEIG.

(Circuit Court of Appeals, Second Circuit.  January 15, 1919.)

No. 90.

1. PHYSICIANS AND SURGEONS ⬭14(1)—DEGREE OF SKILL AND CARE REQUIRED.
    A surgeon or physician attending a patient is bound to possess and to
    give the case such reasonable and ordinary skill and diligence as surgeons
    or physicians in similar localities and in the same general line of practice
    ordinarily exercise in like cases.

2. PHYSICIANS AND SURGEONS ⬭18(6)—ACTIONS FOR MALPRACTICE—BURDEN
    OF PROOF.
    In an action against a surgeon for malpractice the burden rests on
    plaintiff to establish by a preponderance of evidence that defendant failed
    to exercise the skill which the law demanded, or that in his treatment
    of the case he was guilty of negligence.

3. APPEAL AND ERROR ⬭1002—REVIEW—VERDICTS.
    In actions at law in the federal courts the jury are the judges of the
    credibility of witnesses and of the weight of evidence, and if the evidence
    is conflicting, or there is any evidence which, if believed by the jury, is
    legally sufficient to support it, the verdict will not be disturbed by an ap-
    pellate court.

4. EVIDENCE ⬭553(2)—EXAMINATION OF EXPERTS—HYPOTHETICAL QUESTION.
    What facts a hypothetical question must cover are to be determined by
    the sound discretion of the trial judge.

5. EVIDENCE ⬭553(2)—EXAMINATION OF EXPERTS—HYPOTHETICAL QUESTIONS.
    While a hypothetical question should be based upon facts as to which
    there is such evidence that a jury may reasonably find that they are es-
    tablished, it is not in general essential that each hypothetical question
    should embrace every fact which it might be contended should affect the
    expert's judgment.

    Hough, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Eastern
District of New York.

Action by George Greenzweig, an infant, by Bernard Greenzweig,
his guardian ad litem, against Charles D. Napier.  Judgment for plain-
tiff, and defendant brings error.  Affirmed.

The defendant in error, who was plaintiff below, will hereinafter be re-
ferred to as plaintiff.  The plaintiff and his guardian ad litem are citizens of
Russia and residents of the Eastern. district of New York.  The plaintiff in
error, who was defendant below, will be hereinafter referred to as defendant,
and is a citizen of the United States and a resident of the Eastern district.

The defendant is a physician and surgeon, and was at the times hereinafter
referred to and still is attached to the staff of physicians and surgeons at the
Kings County Hospital, in the borough of Brooklyn, city of New York.  The
plaintiff was admitted to the Kings County Hospital on July 7, 1915, to be
treated for a derangement of the bones of his legs, commonly known as bow
legs.

The third and fourth paragraphs of the complaint alleged as follows:

"Third. That the ailment for which the plaintiff was treated was not a
serious ailment, and a proper course of treatment therefor is not dangerous to
the patient, and consists, in part, of the application of a plaster cast to the
leg.

"Fourth. That that part of the plaintiff's treatment at the said hospital con-
sisting of the application of such cast to the plaintiff's leg, and the care and
treatment of the plaintiff thereafter was intrusted by the said hospital authori-

⬭For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ties to, and was undertaken by, the defendants. But the defendants, and each of them, in violation of their duty to the plaintiff, undertook to and did apply a plaster cast to the foot and leg of the plaintiff too tightly, and so unskillfully, negligently, and unprofessionally, and thereafter applied medicines to the foot and leg of the plaintiff so unskillfully, negligently, and unprofessionally, and were thereafter so careless, negligent, and unprofessional in their treatment of the plaintiff, that the said cast restricted the flow of blood to the foot, and the defendants finally found it necessary to amputate and sever the foot and part of the leg of the plaintiff from his body."

Damages in the amount of $50,000 were asked.

The original action was brought against defendant and one Dr. Benjamin E. Wolfort. The jury found in favor of the defendant Wolfort. But they found against the defendant Napier in the sum of $7,500, and judgment has been entered against him, and in favor of the plaintiff, in the amount of $7,709.57.

Nadal, Jones & Mowton, of New York City (Edward P. Mowton, of New York City, of counsel), for plaintiff in error.

Ellenbogen & Selig, of New York City (Samson Selig and John Vernon Bowvier, Jr., both of New York City, of counsel), for defendant in error.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). This is an action for malpractice. It belongs to a class of cases comparatively rare, at least in appellate courts. But occasionally it happens that an attorney, or a physician, or a surgeon, is called upon in a judicial tribunal to defend himself against a charge of a want of skill or a want of care.

In this case the defendant is a surgeon. A surgeon is one who practices surgery, and in the Century Dictionary surgery is defined as:

"Therapy of a distinctly operative kind, such as cutting operations, the reduction and putting up of fractures and dislocations, and similar manual forms of treatment."

In Webster's New International Dictionary the term "malpractice" is defined as:

"The treatment by a surgeon or physician in a manner contrary to accepted rules and with injurious results to the patient; hence, any professional misconduct or any unreasonable lack of skill or fidelity in the performance of professional or fiduciary duties; wrongdoing. A question of professional malpractice or negligence is determined by what might be reasonably required under the circumstances of the case."

[1] The law is well established that a surgeon or physician attending a patient is bound by his contract to possess and to give the case such reasonable and ordinary skill and diligence as surgeons or physicians in similar localities and in the same general line of practice ordinarily exercise in like cases. Wharton's & Stille's Medical Jurisprudence (5th Ed.) vol. 3, § 473. See also Pike v. Honsinger, 155 N. Y. 201, 49 N. E. 760, 63 Am. St. Rep. 655; Carpenter v. Blake, 75 N. Y. 12; Hitchcock v. Burgett, 38 Mich. 501; English v. Free, 205 Pa. 624, 55 Atl. 777.

We have said that a surgeon or physician is bound by his contract to possess and exercise reasonable skill and diligence. His contract un-

doubtedly imposes such an obligation. But the law imposes such obligation even if there is no contract. Thus in Styles v. Tyler, 64 Conn. 432, 463, 30 Atl. 165, 176, the court said:

"The obligation of a physician to exercise ordinary care and skill arises not so directly from the contract of employment as from the duty imposed upon him by law, which requires him in the exercise of a skilled and privileged profession to use at his peril that degree of skill and care which the law says shall be requisite for the practice of such profession. The violation of that duty is a wrong which entitles the person who suffers from that wrong to legal redress. This duty, and the right of action consequent on its violation, existed before the law recognized any contract of employment, and when the only compensation a physician could receive for his services was the honorarium paid at the option of the patient."

In Savings Bank v. Ward, 100 U. S. 195 (25 L. Ed. 621), the Supreme Court of the United States, discussing to some extent the doctrine of malpractice, points out at page 200 that beyond all doubt the general rule is that the obligation of an attorney grows out of contract, and is to his client, who employs him, and is not, in the absence of fraud or collusion, to a third party, who does not employ him, and at page 203 the court points out that there are exceptional cases in which privity of contract is not essential to the maintenance of an action, as where "a patient" is "injured by improper medicines prepared by an apothecary, or one is unskillfully treated by a surgeon."

The liability of the physician and of the surgeon is in this respect not unlike that of an apothecary or pharmacist. If one who compounds or sells medicines carelessly labels a poison as a harmless medicine, and sends it so labeled into the market, he becomes liable to any one who without fault on his part uses it and is thereby injured. In such a case the liability does not arise from contract, but from the duty, imposed by law upon him who falsely labeled it and sent it forth, to avoid acts which in their nature are dangerous to the lives of others. See Thomas v. Winchester, 6 N. Y. 397, 410, 57 Am. Dec. 455, which is the leading case in this country. We recognized the doctrine in a recent case involving the liability of a vendor of unwholesome food products. Ketterer v. Armour & Co., 247 Fed. 921, 160 C. C. A. 111, L. R. A. 1918D, 798.

Inasmuch as the surgeon's obligation is imposed by the law, the law requires the same degree of care and diligence of the surgeon, or of the physician, when his services are rendered gratuitously as when he receives compensation. Wharton & Stillé's Medical Jurisprudence (5th Ed.) vol. 3, § 478; Edwards v. Lamb, 69 N. H. 599, 45 Atl. 480, 50 L. R. A. 160; Peck v. Hutchinson, 88 Iowa, 320, 55 N. W. 511; Becker v. Janinski (N. Y.) 27 Abb. N. C. 45. So that no question is raised in this case as to whether the child or the child's father (the guardian ad litem) was under agreement to compensate or had compensated this defendant for his services. No such question was presented to us.

[2] In cases of alleged malpractice the burden is upon the plaintiff to establish that the defendant failed to exercise the skill which the law demanded, or that in his treatment of the case he was guilty of negligence. Brown v. Goffe, 140 App. Div. 353, 125 N. Y. Supp. 458. The plaintiff must establish this by a preponderance of the evidence.

Wood v. Wyeth, 106 App. Div. 21, 94 N. Y. Supp. 360. And in the case at bar the jury were properly instructed in these respects. The court was asked to charge, and did charge, as follows:

"The burden is upon the plaintiff to establish negligence on the part of Dr. Napier by a fair preponderance of the credible evidence, and in the event that he fails to sustain the burden, or in the event that the evidence on the question of negligence on Dr. Napier's part is evenly balanced, the verdict must be for Dr. Napier."

The law relating to malpractice is well settled. Whatever difficulty there is arises from the fact that its simple and well-settled principles are sometimes difficult in their application. The complaint is that, when it was apparent on July 12th that the cast or the bandages were too tight and interfered with the proper circulation of the blood, as disclosed by the swelling of the toes and their cyanosed condition, the defendant prevented the opening of the cast and the bandages and their removal until July 16th, when gangrenous conditions had set in which made amputation necessary. It is not claimed that on August 21st, when the amputation occurred, it was not necessary, or that it was not skillfully done. The defendant did not perform the operation. All the testimony agrees that from July 16th to August 21st everybody did all they could to make amputation unnecessary. And no fault is found, so far as this defendant is concerned, with what happened prior to July 12th, when the defendant first took charge of the case.

The testimony introduced by the plaintiff is in conflict with the testimony given by the defendant, which is in part confirmed by others. But it is for the jury, and not for this court, to say what the testimony established.

The ailment for which the plaintiff in this case was treated was not of a serious nature, and a proper course of treatment therefor is not dangerous to the patient. The plaintiff, a boy of five years of age, was bow-legged, and it was necessary to operate on both legs below the knee. But the treatment in this case made it necessary to amputate the left leg from a little below the knee down, and this notwithstanding the fact that the experts had never known of an amputation which resulted from an operation for bow legs. So that a jury might well conclude that, if in this case there was such an operation, some one was guilty either of negligence or want of skill; and the question the jury had to decide was to determine whether this defendant in what he did or did not do was at fault. The operation to straighten the legs seems to have been performed in the usual manner, by making an incision through the skin at the lower end of the tibia, separating the muscles, and inserting a chisel and making a cut in the bone of each leg two-thirds of the way through. In preparation for the operation, the patient's legs were scrubbed with soap and water, then washed with a bichloride solution, covered with sterile dressings saturated in bichloride of mercury, and he was then removed to the operating room. The operation on the left leg was performed by Dr. Wolfort, assisted by Dr. Tarbox and an interne, Dr. Mayes by name. The operation on the right leg was performed by Dr. Tarbox. The bones were fractured, set in position, the wounds closed, the skin sutured, the bleeding

stopped, the legs bandaged, and plaster applied. Over the sterile dressing on the leg a gauze pad was applied, and over the pad sheet wadding was placed. Over the gauze and pad another gauze was wrapped, after which a plaster of paris bandage was wrapped around the leg, outside of the dressings and padding. The pad was put between the dressing over the wound and the plaster of paris to permit and allow for, and not interfere with, the swelling that always follows such an operation.

The defendant, however, insists that the plaintiff failed to establish any negligence whatever on his part that can be said to be the proximate cause of the loss of the leg. If there is no such evidence, of course, this judgment must be reversed; for it is within the province of this court to examine the record and say whether or not there is any evidence from which the jury might conclude that the defendant had not exercised such care as the law demanded of him under the circumstances.

The defendant as we have said was a visiting surgeon on the hospital staff. The hospital contained both adult and infant wards. The visiting surgeons took turns in visiting these wards and at stated periods exchanged services; that is, the visiting surgeon to the adult ward would exchange with the visiting surgeon to the infant ward. At the time the operation to cure the bow-legged condition occurred, and when the casts were put on, which as we have seen was on July 7th, the defendant was in charge of the adult ward, and so was not in any way responsible for what took place in the infant's ward, then in charge of another member of the hospital staff. The defendant did not see the plaintiff until July 12th, which was the first day after the operation, when the defendant in the ordinary course of his work made a visit to the hospital. No complaint is made against this defendant concerning anything that happened prior to defendant's visit on that day.

The first witness called for the defendant, one of his friends and a member of the hospital staff, testified that two conferences by the defendants were held to prepare this case for trial; that at these conferences the two defendant doctors, including the witness, were present; that the whole case was gone over; that the records were examined; that there was a general discussion, and that the specific time covered in the consideration of the question of who, if any one, made a mistake in treating the child, was the time from the original application of the cast up to the 12th of July, when defendant claims he first took professional notice of the case; and that they all came to the unanimous conclusion that up to the 12th of July, nothing happened to impose blame on anybody.

It is true that the evidence discloses that the cast on the left leg had been put on too tight. But the defendant had nothing to do with the putting on of the cast which was done on July 7th. And this was made plain to the jury, the court charging as follows:

"Dr. Napier is not responsible for any condition of the plaintiff's leg that arose either by reason of the operation for the cure of bow legs, or by reason of any subsequent treatment or lack of treatment after that operation and before Dr. Napier saw the plaintiff on July 12, 1915."

It is extremely difficult to determine, when a cast is put on, whether it is too tight. In order to make sure that it is not too tight, and that the pressure may be discovered in time, it is customary to leave the toes exposed and outside the cast. If the cast or the bandages are too tight, the fact is indicated by the toes beginning to swell and turn blue, which shows that the circulation is being interfered with. The proper procedure then is not to remove the cast at once, but to cut the cast or bandages a certain extent, and if the patient's condition improves to proceed no further, but if it does not improve to cut more and more, and if necessary to remove the entire cast, and even the bandages under the cast, in order to relieve the pressure and allow the blood to circulate properly through to the foot.

The testimony in this case is that there was a swelling of the toes of the left foot, followed by cyanosis. There is evidence that when this condition was discovered the interne cut down the plaster around the toes and up the leg a distance of five or six inches, and that relief followed. This relief was not sufficient, and the same conditions again asserted themselves. Thereupon the interne says that he cut the cast from the bottom to the top, and intended spreading the cast and cutting the bandages beneath, so as to eliminate the pressure from the leg. But his testimony is that, just as he cut the cast, the defendant appeared in the ward and told him to stop, and not to proceed further with it; and because of this order, which the interne was bound to obey as coming from his superior, nothing further for the relief or spreading of the cast was done until July 16, when the cast was removed by one of defendant's assistants and a looser cast was applied. The defendant, however, denies that he directed the interne to stop the cutting on July 12th, and he testified that the defendant himself proceeded to cut the cast at that time, on July 12th, from end to end, and the bandages beneath, which he removed, having spread the cast apart like a trough. There was thus a direct conflict in the evidence, and it was for the jury, who saw and heard the witnesses, to determine what the truth was. The entries in the hospital or bedside history of the case, made from day to day, confirmed the interne's account of what happened. It contained no statement of any cutting of the cast or spreading of it by the defendant, or any dressing of the leg on July 12th. The entry made by the interne at the time and under date of July 12th reads:

"The child, when asked where hurt, pointed to right leg. Cast on this leg cut down; window inserted over wound; seemed healthy; cast not removed. Cast on other leg cut down, and at about the time was cut down was advised by Dr. Napier [defendant] not to remove cast. Heavy dressing applied; child's leg rested on pillow."

The nurse was corroborative of the interne. She was asked by counsel whether she was in the hospital on July 12th, when the interne was at the bedside of the plaintiff, and she answered, "Yes." And the court then asked, "At the time he [the interne] was cutting the cast?" to which she replied, "Yes." Then followed question and answer as follows:

"Q. Were you there when Dr. Napier and Dr. Tenopyr came along, while he was so engaged? A. Yes.

"Q. Did you hear or see Dr. Napier and Dr. Mayes engaged in any conversation? I don't ask whether you heard what they said, but did you see them converse? A. Yes, sir.

"Q. After the conversation took place, was there anything more done to the cast than had already been done by Dr. Mayes prior to the conversation? A. Not that I remember.

"No cross-examination."

And the entry made by the nurse on July 12th states:

"Cast cut by Dr. Mayes (the interne). Child crying and restless."

This testimony supports the interne that he did the cutting of the cast, and it contradicts the defendant's testimony in the particulars already stated. Moreover, if the defendant did what he testified he did, it is strange that the fact is not recorded in the bedside history of the case. There is other testimony given by the defendant, which we do not consider it necessary to set forth in this opinion, which might easily have produced an unfavorable impression upon the jury. But this court does not sit to weigh evidence. It is not for us to say whether the defendant's testimony was true or untrue, and we do not pass judgment upon it. It is indisputable, however, that there is testimony in this record which would justify a jury, if they believed it, in finding that this defendant did not do what he said he did, and that he did do what the interne said he did, viz. prevented the removal of the cast at a time when, according to the expert testimony, it should have been removed, and when it would have been removed by the interne, if he had not been stopped by the defendant when he (the interne) was in the act of removing it.

[3] It is said that the testimony upon which the verdict is based is incredible. The answer is that, while it is the duty of a court to determine the competency of a witness, the credibility of the witness is for the jury. It is true that testimony may be so manifestly untrue that it may be the duty of a court to reject it as wholly barren of evidentiary value. If the testimony of a witness is opposed to the laws of nature that lie within the court's judicial knowledge, it has been held that it should be disregarded as false. Weltmer v. Bishop, 171 Mo. 110, 71 S. W. 167, 65 L. R. A. 584. And where one says he looked and did not see an object which, if he had looked, he in the nature of things must have seen, he cannot be credited, if he says he did not see the object. See R. C. L. vol. 10, p. 1009. It is an extraordinary case, however, when a court can disregard testimony as incredible, and the doctrine of incredibility in the sense above referred to is clearly not applicable to the testimony in this case.

It is also said that the verdict is not only against the weight of the evidence, but that it is contrary to the evidence. The answer is that appellate courts of the United States do not sit to weigh conflicting testimony. St. Louis Paper Box Co. v. J. C. Hubinger Bros. Co., 100 Fed. 595, 40 C. C. A. 577; Western, etc., Co. v. Berberich, 94 Fed. 329, 36 C. C. A. 364; Meyers v. Brown, 102 Fed. 250, 42 C. C. A. 320. The jury are the judges of the weight of the evidence; and if there is any evidence which, if believed by the jury, is legally sufficient to

support the verdict, it will not be disturbed. Lincoln v. Power, 151 U. S. 436, 14 Sup. Ct. 387, 38 L. Ed. 224. And where the evidence is conflicting an appellate court does not interfere. Troxell v. Delaware, 227 U. S. 434, 33 Sup. Ct. 274, 57 L. Ed. 586.

[4, 5] The defendant objects to the form of the hypothetical question which was asked of the plaintiff's expert. What facts a hypothetical question must cover are to be determined by the sound discretion of the trial judge. It is true that a hypothetical question should ordinarily be based at least upon the direct examination, upon facts as to which there is such evidence that a jury may reasonably find that they are established. Denver, etc., R. Co. v. Roller, 100 Fed. 739, 41 C. C. A. 22, 49 L. R. A. 77; Young v. Johnson, 123 N. Y. 226, 25 N. E. 363. And it is not in general essential that each hypothetical question should embrace every fact which it might be contended should affect the expert's judgment. Swensen v. Bender, 114 Fed. 1, 51 C. C. A. 627; People v. Krist, 168 N. Y. 19, 60 N. E. 1057; State v. Doherty, 72 Vt. 381, 48 Atl. 658, 82 Am. St. Rep. 951; Howard v. People, 185 Ill. 552, 57 N. E. 441. In the instant case the hypothetical question assumed that there was no cutting of the cast by the defendant; but that was part of the plaintiff's testimony and was properly included in his hypothetical question. It also assumes that the cast was allowed to remain on the left leg from the 12th to the 16th of July; but there was testimony to that effect in the case, and the plaintiff had the right to include it in the hypothetical question. We are satisfied that the objections raised to the hypothetical question are without merit.

Judgment affirmed.

HOUGH, Circuit Judge (dissenting). I agree with the statements of law made in the opinion of the court and relating to the general liability of physicians and surgeons in respect of claims for malpractice, but as to the trial of this particular case I am of opinion that it was so managed, especially in respect of the allowance of unfair and misleading hypothetical questions as to produce a result at once unjust and unlawful.

For this reason I dissent.