## STATE *v.* JOSEPH BEAN.

January Term, 1905.

Present: ROWELL, C. J., TYLER, START, WATSON, HASELTON, and POWERS, JJ.

Opinion filed May 13, 1905.

*Criminal Law—Homicide—Evidence—Proof of Conspiracy—Former Attempts—Accomplice—Corroboration—Experiments.*

The admission of immaterial evidence does not vitiate, if it can be said not to have harmed the excepting party.

In a prosecution for murder, the State claimed that the respondent killed the deceased out of jealousy and in order to end the latter's improper relations with a certain married woman; and a witness for the State testified that the respondent tried to hire him to act as detective, and spy upon the deceased and the woman; and then testified in regard to a trip that he made with the respondent, and stated that in the course of the journey they went to the depot, and then answered, subject to exception, that he then went to the doctor's, but that respondent did not go. *Held,* that the testimony excepted to was without significance, and its admission was harmless.

After this witness had testified that he consented to act as such detective, and that the respondent undertook to provide him with money, it was proper to allow him further to testify that, by the respondent's direction given in the witness's presence, the witness received from a third person an order for $3.

This witness further testified that he went to the woman's house, as respondent desired, and received from her a letter which respondent wanted he should get; and which the witness read there, carried away, read to the respondent, and gave to him. *Held,* that the testimony as to the witness reading the letter, however immaterial, was harmless.

Whether relevant testimony is too remote in time or place is a preliminary question for the trial court, and will not ordinarily be revised.

When the declarations of a party are given in evidence against him, all that he said upon the subject at the same time must be received and weighed.

For the purpose of showing motive on the part of the respondent and that he killed the deceased out of jealousy and in order to end the latter's improper relations with a certain married woman, a witness for the State testified that he met the respondent and questioned him about a pair of horses belonging to the respondent, and that the respondent replied that all the woman's family had seen the horses, except her husband who was then in Canada; and that the respondent then added that he supposed the deceased and the woman were going to Canada on a visit when her husband got back; that he had heard they were, but did not know. *Held,* that the testimony was admissible as tending to show that the respondent was brooding over the relations between the deceased and the woman.

A witness for the State testified that, shortly before the homicide, the respondent stated in answer to a question that, if deceased remained at the woman's home, it would be doubtful about the witness getting his pay continually from her husband. *Held,* that the circumstances in which this answer of the respondent was given go only to the weight of the evidence, and that the contention that the answer was in response to a confidential inquiry will not be considered, it not appearing that the inquiry was confidential, nor that this objection was made in the trial court.

Prior attempts by one to commit a crime for which he is being tried are evidence against him, although the crime was not finally committed by the same means used in such prior attempts.

Certain testimony *held* to corroborate that of a witness who testified in detail to two expeditions with the respondent, undertaken for the purpose of executing a conspiracy—not consummated—between himself and the respondent to kill the deceased.

The respondent having introduced evidence tending to show that a witness for the State had been influenced by threats of imprisonment to testify that there had been a conspiracy between himself and the respondent to kill the deceased, it was competent for the State to show that he made similar statements before the alleged threats.

It appeared that the deceased received his death blow in the evening at his barn near a certain house. A son of the householder testified that he saw a man that evening looking in at the kitchen window who he thought was the respondent, though he could not swear positively. Later respondent introduced evidence of an experiment made the evening of the homicide, when the son went out and stood by the window, and his mother stood in the same place he had,' and looked out of the window, and she was then asked if she looked "to see if she could tell who was out there"; and she answered, "No; I saw some one there, but could not see who it was." *Held,* that, as it did not appear that the respondent, in the time of it, disavowed the irresponsive part of the answer, but was letting it stand for what it was worth, it was not error to permit the State to give evidence in regard to such an experiment, since the court might well have regarded the door open for rebuttal.

Where, on a prosecution for murder, a witness for the State had testified that there had been a conspiracy between himself and the respondent to kill the deceased, it was material for the State to

show that this witness was where he could not have killed the deceased, since it would have been legitimate argument that this witness might have committed the crime.

On a prosecution for murder, the State claimed that deceased was killed by blows on the head with a stake from an old hay rack, which stake the respondent took from the house of H., and which, in his flight back, he threw into the bushes, where it was found. H. testified that he once had an old-fashioned hay rack, with bed pieces, raves, and stakes, and described how the raves were held up by stakes. Another stake was introduced in evidence, concerning which another witness testified that shortly after the homicide he saw under H.'s carriage shed the raves of an old hay rack, with holes bored through them, evidently to set down onto stakes; that he measured the holes the Sunday before he testified and then saw the stakes there. *Held,* that the admission of this evidence and the introduction of the second stake was not error, as this stake connected the respondent with the other stake by tending to show that it came from H.'s.

On a prosecution for murder, though the charge of the court be construed as limiting the jury to a consideration of the matter solely as presented by the arguments of counsel, based on the evidence, error is not apparent when it does not appear that counsel did not present the matter in every view warranted by the evidence.

On a prosecution for murder, the theory of the defence was that deceased had met his death through some accident; and the court charged that, if the jury failed to find that the death was caused by human agency, that would end the case in favor of the respondent, but that if they considered that "the theory of accidental death cannot be reasonably entertained on the evidence," there remained the question whether the respondent inflicted the injuries. *Held,* that there was no error in the manner of submitting the question of accidental death; the court having instructed as to the burden of proof and reasonable doubt, and having told the jury that, the evidence being circumstantial, it must be such as to exclude every reasonable theory consistent with innocence.

INDICTMENT FOR MURDER. Plea, not guilty. Trial by jury at the December Term, 1903, Windsor County, *Munson,* J,. presiding. Verdict, guilty of murder in the second degree;

judgment and sentence thereon. The respondent excepted. The opinion fully states the case.

*W. B. C. Stickney* for the respondent.

As Root's death was not claimed to have resulted from the conspiracy between Martel and the respondent, the State should have been limited to showing the existence of the conspiracy, and should have been prohibited from showing acts of Martel claimed to have been done in pursuance of the conspiracy. *Com.* v. *Campbell,* 7 Allen 541; *Schaffner* v. *Com.,* 72 Pa. St. 65; *Martin* v. *Com.,* 93 Ky. 189.

The professed corroboration of Martel, who was a confessed accomplice, in respect of his trip over the mountain in pursuance of the conspiracy, was not corroboration in regard to material facts, and so inadmissible. *Com.* v. *Bosworth,* 22 Pick. 397; *Ormsby* v. *People,* 53 N. Y. 475; *People* v. *Plath,* 100 N. Y. 590; *Com.* v. *Holmes,* 127 Mass. 424.

*Clarke C. Fitts,* Attorney General, *Charles Batchelder,* State's Attorney, *Herbert H. Blanchard* and *John G. Sargent* for the State.

Rowell, C. J.   The prisoner is under conviction of murder of the second degree for killing Ephrain Root on October 12, 1903.   It appeared that Root lived at John Green's at the time of the homicide, and that the prisoner had made it his home there for about eighteen years next before June, 1903.

The State claimed, and its testimony tended to show, that Root had so ingratiated himself into the favor of Mrs. Green, John Green's wife, as to interrupt the prisoner's improper relations with her, and that the prisoner slew him, to get rid of him.

Chatfield, a witness called by the State, told of a trip to Rochester that he made with the prisoner one day in the fall of 1903, and testified that in the course of the journey they went to the depot, and was then asked where they went next, and answered, subject to exception, that he went to the doctor's, but that the prisoner did not go; that the witness got out at the corner, and the prisoner went along. The witness had testified that the prisoner had tried to get him to go to Green's as a detective, and told him there was a fellow staying there that the Green boys wanted to get out; that there had been a detective up there, but some one saw his badge, and he went away the next morning; that the witness declined to go. It is claimed that the testimony objected to was altogether immaterial, and, in view of the effort of the State to identify the witness with the prisoner, and to hold the prisoner responsible for the witness's actions, its admission was prejudicial, as tending to create a false issue and to mislead the jury. But the admission of immaterial evidence does not vitiate if it can be said not to have harmed the excepting party; and this testimony was so completely without significance that it is clear it could not have harmed the prisoner in the respects suggested nor otherwise.

The witness further testified that he finally consented to go to Green's as the prisoner requested, and that on a Tuesday morning the prisoner took means to get some money for him to go with; and subject to exception he said that he received an order for three dollars from Mr. Belden by the prisoner's direction, given in the witness's presence. It is objected that this was error, for although it may have been permissible for the State to show the employment of the witness, and that he was paid by the respondent, the details were immaterial, and tended to divert the minds of the jury from the main issue, and to prejudice them against the prisoner.

But as the obtaining of the money was a part of the transaction of procuring the witness to go to Green's as a detective, it was proper to show the fact of obtainment by detailing the manner of it. This is not like excluding the details of a quarrel, to which it is likened, for there the only question is whether the witness is hostile to the opponent, not how it arose nor who was to blame; and as the details of the quarrel do not explain away the hostility, and may unfairly prejudice the opponent, they are not admitted, 2 Wig. Ev. § 952, (2).

The witness further testified that he went to Green's as the prisoner desired, and there said and did what the prisoner directed him to, and told what that was; that he there saw and talked with divers persons, whom he named, and among them, Mrs. Green, from whom he received a letter that the prisoner wanted he should get, and which he read there, carried away, read to the prisoner, and gave to him, telling him all he had said and done. The letter was produced, and the prisoner admitted that he procured it to be written. To the witness's saying that he read the letter there, the prisoner excepted, as immaterial and prejudicial. It is enough to say that the mere fact that the witness read the letter there, and to himself it would seem, however immaterial, signified nothing, and could not have been harmful.

For the purpose of fixing the dates of certain transactions between the prisoner and the witness Chatfield, one Stockwell testified for the State that on September 29th he let Chatfield have $3.00, which he charged to Farr & Kennedy, and which was paid to him on October 3d. To the admission of this testimony the prisoner excepted as too remote. But whether testimony, relevant in its nature, is too remote in time or place, is a preliminary question for the trial court, and will not, ordinarily, be revised. *Dover* v. *Winchester,* 70 Vt. 418, 41 Atl. 445; *State* v. *Doherty,* 72 Vt. 381,

390, 48 Atl. 658. Nothing appears here that calls for a revision of that question.

The State introduced evidence tending to show that in the summer or fall of 1903, a stranger came to Mrs. Wiley's house,—where Root lived before going to Green's,—and stayed there two or three days, having no apparent business, but remaining in the house most of the time, apparently watching the premises, and particularly Green's house; and it was claimed that the prisoner procured this man to go there for the purpose of frightening Root and Mrs. Green, and thereby breaking up their intimacy, which, the State claimed, excited the prisoner's jealousy. The only evidence claimed to have any tendency to show the stranger's business was that of the prisoner's statements to various witnesses. To show the prisoner's connection with the alleged detective, and his motive and purpose to get Root out of the way, Mrs. Huntley, a witness for the State, testified, among other things, that the prisoner told her that he had met a detective, who offered him fifty dollars to say anything against Mrs. Green's character; that he told the detective he knew nothing about her character, and should have nothing to say if he did; that he had been up to Mrs. Green's, and she asked him to say nothing about it, and cried, and told him they were going to make trouble for her and Root, and wanted him to put in money to help her; that he heard that Mrs. Wiley had a couple of detectives watching Root and Mrs. Green, and that the first thing the witness would hear there would be one of them killed; that he asked Mrs. Green why she did not send Root away, and she said that Root had always been a dog for everybody, and she should not turn him out for anyone; that he told Mrs. Green that Root had made a good dog for her, and he should hate awfully to be in Root's boots; that there was jealousy between Mrs. Wiley and Root, and he thought there would

be some trouble before they got done; that he knew nothing about Mrs. Green's character only what Louis Lapan told him, which was, that he caught Root and Mrs. Green in intercourse together. All of the testimony of this witness was excepted to generally, and that part about what the prisoner said Lapan told him was excepted to particularly; but no ground of exception was stated in either case. It did not appear whether Lapan did thus catch Root and Mrs. Green, nor whether he ever told the prisoner that he did. There is a general statement in the bill of exceptions that the relations between Root and Mrs. Green were the subject of neighborhood talk, but it does not appear that there was any exception to that line of testimony. The prisoner's brief mentions only the exception to that part of the testimony as to what the prisoner said Lapan told him. It then states what the bill says about evidence of neighborhood talk, and submits "that this rehearsal of neighborhood talk was immaterial, and should not have been allowed," and makes no other objection. We take the objection to be to the admission of what the prisoner said Lapan told him, and to nothing else. As to this the rule is when the declarations of a party are given in evidence against him, that all he said upon the subject at the same time must be received and weighed. *Mattox* v. *Lyman*, 18 Vt. 98; *State* v. *Mahon*, 32 Vt. 241. And the reason is, because the thought as a whole, and as it actually existed, cannot be ascertained without taking the utterance as a whole, and comparing the successive elements and their mutual relations. To look at a part alone, would be to obtain a false notion of the thought. The total and real meaning can be got at only by going on to the end of the utterance. One part cannot be separated, and taken by itself, without doing injustice by producing misrepresentation. 3 Wig. Ev. § 2094, p. 2821. This is like con-

struing a written instrument, which you take by the four corners, and look at the whole and every part.

For the purpose of further showing the like motive and purpose on the part of the prisoner, Mr. Huntley was allowed to testify under exception, that he met the prisoner one day, and spoke to him about a pair of horses of the prisoner's; that in answer to his inquiry the prisoner said the Greens had all seen the horses except Mr. Green, who was then in Canada; and that the prisoner then added that he supposed Root and Mrs. Green were going to Canada on a visit when Green got back, that he had heard they were, but did not know whether they would or not. It is objected that this addition was inadmissible, and had no bearing on any issue in the case. But we think it was admissible for the purpose for which it was offered. The prisoner went out of his way to say that, which was susceptible of being thought to indicate that his mind was brooding on the relations between Root and Mrs. Green, which would strengthen the claim of the State in this respect.

A witness called by the State testified that a short time before Root was killed, he had a conversation with the prisoner in which he said in reply to a question by the witness, that if Root stayed at Green's it would be doubtful about the witness's getting his pay from Green continually. It is objected that the prisoner had a right to answer this confidential inquiry, and that the answer given in such circumstances could have no bearing on any issue in the case. But it does not appear that the inquiry was confidential, nor that the answer was objected to on that ground; and the admissibility of the answer is now questioned only because of the circumstances in which it was given. But those circumstances go only to its weight, not to its admissibility.

Elmer Martel, a witness for the State, testified to conversations with the prisoner in which, at the prisoner's solici-

tation, the witness agreed to kill Root for fifty dollars, which the prisoner agreed to pay him. He also testified in detail to two expeditions with the prisoner, undertaken for the purpose of executing the plot. Martel's testimony was the only evidence as to conversations between him and the prisoner about the hiring and the plot, which the prisoner denied. Martel testified on this subject that Friday night, Oct. 2d, he slept with the prisoner at Frank Hubbard's, where the prisoner was staying, and that an arrangement was then made between them at the prisoner's solicitation that they would go across Brandon mountain the next day; that the prisoner should borrow Hubbard's rifle, and take it to some place on the mountain road above the Green mill, and there deliver it to the witness, who should take it and go across the mountain just behind the prisoner and his team, for the purpose of shooting Root if he should meet him on that road, as it was expected, from the prisoner's knowledge of Root's movements, that he would at the time of day the trip was to be made; that if the prisoner met Root, he should turn and follow him back towards the witness, and if the prisoner heard a gun, he should go at once to the witness, and they would go together to the house of one Crapo in Goshen, the prisoner assuring the witness that they could prove by Crapo that they had been at his house together all night; that pursuant to this arrangement the witness went the next day by a roundabout way to the meeting place agreed upon on the mountain road, and there waited in the bushes beside the road between the house of Bruno Green and that of Mrs. Mary Derby; that the prisoner came past where the witness was waiting, got out of his wagon, and placed Hubbard's rifle and some cartridges on the ground at the place agreed upon, got back into his wagon, and drove along up the mountain; that the witness then took the rifle and the cartridges, and went up the mountain afoot behind the prisoner,

and crossed the mountain, and met Root near the top on the Brandon side, and that then W. F. Huntington was there in the road near by with his team; that the witness stopped and talked with Huntington, and while talking with him, fired the rifle in the air, and then hurried on towards Brandon afoot, leaving the rifle in the ditch beside the road.

The State introduced the testimony of many witnesses, to corroborate Martel's story, to which the prisoner excepted, for that the testimony was not corroborative of his story; that the circumstances thereof were not material nor in issue, and not such as a corroboration could be predicated upon.

Before this line of testimony was introduced, Crapo and wife had testified without objection about the prisoner's being at their house in Goshen on the Brandon side of the mountain near the top, and about his having gone out with a lantern, claiming to have lost a blanket, and about seeing him again, when going to church the next day, Sunday, after he had left their house to go towards Brandon, returning from that direction on the road to Rochester. The first of these many witnesses was one Severy, by whom the State offered to show that he was at work on the mountain road the 3d of October, and saw the prisoner and the Martel boy there. Thereupon the prisoner admitted that he stayed at Crapo's over night, and went out with a lighted lantern, and that he understood that Martel went over the mountain at the time he testified he did.

It appeared that the prisoner procured a revolver from his brother in Springfield, Mass.; and there was evidence that he had Hubbard's rifle and said revolver in his possession when staying at Hubbard's, and that the rifle and the revolver were in Martel's possession at places away from Hubbard's after the prisoner borrowed the rifle. The State's evidence tended to show that Martel procured the revolver from the prisoner at Hubbard's on Friday night, October 2d, and that he re-

turned to Hubbard's on Sunday, October 4th, and left the revolver and the rifle there.

No claim was made that either the rifle or the revolver was used in killing Root; but Martel's testimony tended to show that when he had the rifle and the revolver in his possession, the prisoner had reason to believe that he might use the rifle to shoot Root according to the plot; but there was no evidence that he attempted it.

It is objected that if Martel's testimony had any tendency to connect him or the prisoner with Root, it was, in effect, that pursuant to an agreement with the prisoner, Martel undertook to kill Root by shooting him, and started upon that expedition, but failed in his purpose; that though it may be claimed to have a tendency to show that the prisoner intended to make way with Root, it cannot be claimed to have any tendency to show that Root's death was the result of a plot on the part of the prisoner to murder him with Martel's assistance. It is contended that inasmuch as Martel neither had, nor is claimed to have had, any part in killing Root, it was enough for the State, if its purpose was to show a murderous intent on the part of the prisoner, to introduce evidence of the plot, and that it was unlawful to prejudice the prisoner by evidence of Martel's attempt to carry out the plot, whether the abandonment was from lack of opportunity or because Martel changed his purpose; but that the State, not content with this, went further, and introduced the testimony excepted to, the real effect of which was, to show that in the afternoon of October 3d, the day in question, Martel was seen by some of the witnesses on the Brandon road on the Rochester side of the mountain, and by some on the Brandon side, sometimes with a gun, and sometimes without one.

It appeared that Green's mill was on that road on the Rochester side of the mountain, and that Bruno Green's house

was on that road next above the mill, and Mrs. Derby's house next above Bruno Green's.

Some of said witnesses testified to seeing Martel at Green's mill in the afternoon of the day in question, and in the road below Mrs. Derby's house, without a gun, and some, that he disappeared up the road, followed by the prisoner, who had a horse and carriage, and soon reappeared at Mrs. Derby's, following the prisoner, and had a gun, which other testimony tended to show was Hubbard's rifle. Some testified that the prisoner and Martel talked together at the mill. Others testified to meeting them later that afternoon when the witnesses were returning from Brandon. Some said they met them near the top of the mountain on the Rochester side; and some, that they met them near the top and at varying distances below the top, on the Brandon side, Martel always being behind the prisoner, and always carrying a gun, except below where he said he left the rifle in the ditch beside the road, he was seen without a gun.

There was testimony other than Martel's, tending to show that the prisoner and Martel slept together at Hubbard's on Friday night, October 2d, and that the prisoner rose early Saturday morning, October 3d, and left Hubbard's alone, saying he was going to Hancock; that he returned to Hubbard's during the afternoon, and inquired for Martel, and went to several houses in the vicinity in search of him; that he borrowed Hubbard's rifle Friday night, October 2d, and that the rifle was returned to Hubbard's on Sunday, October 4th, and that the prisoner's revolver was in his own possession that Friday night, and was brought to Hubbard's that Sunday with Hubbard's rifle, by Martel.

The prisoner testified that he went across the mountain Saturday, October 3d, and passed Martel between the houses of Bruno Green and Mrs. Derby, and that Martel rode with

him part of the way between those houses, and had no rifle nor gun of any kind with him on the road that day at any time when he saw him, and that he himself had no rifle that day, and had no knowledge of Martel's having one, nor any gun of any kind.

It is further objected that if the foregoing testimony, aside from Martel's, is to be regarded as circumstantial evidence from which is to be inferred the probability of the prisoner's connivance with Martel in a plot to murder Root, it is lacking in that it has no tendency to confirm Martel's statement of procuring the rifle from the prisoner; and further, that it shows that having procured the rifle, he did nothing with it except what was perfectly innocent; that unquestionably it has no tendency to prove that the prisoner committed the crime charged, namely, the murder of Root with a bludgeon by lying in wait for him at his stable door on the night of October 12th, and that it cannot be connected with the alleged design to accomplish such a crime; that the most that can be claimed for it is, that it shows an opportunity to carry out the alleged plot if in finding Root the circumstances favored its execution.

To the objection that though Martel's testimony may have tended to show that the prisoner intended to make way with Root, it did not tend to show that Root's death was the result of a plot on the part of the prisoner to murder him with Martel's assistance, and that, inasmuch as Martel had nothing to do with the murder, it was enough for the State, if its purpose was to show a murderous intent on the part of the prisoner, to introduce evidence of the plot, and that the details of Martel's attempt to execute it were inadmissible and harmful,—the answer is that though harmful they were admissible, both because they corroborated Martel's story of the plot itself, and because they so connected the prisoner

with the attempt as to make him a participant in it, and there-
fore tended to fix the murder upon him, the rule being that
prior attempts by one to commit the crime for which he is
being tried, are evidence against him. *State* v. *Ward,* 61 Vt.
153, 181, 17 Atl. 483.

To the further objection that if the foregoing testimony,
other than Martel's, is to be regarded as circumstantial evi-
dence from which is to be inferred the probability of the pris-
oner's conniving with Martel in a plot to murder Root, it is
lacking in that it has no tendency to confirm Martel's state-
ment of procuring the rifle from the prisoner,—the answer is
that it does have such tendency, especially when taken with
the testimony, other than Martel's, of the prisoner's having
borrowed Hubbard's rifle Friday night, October 2d, the ex-
pedition over the mountain being the next day, when that
testimony shows the prisoner and Martel at Green's mill, talk-
ing together, Martel having no gun; shows Martel going up
the road from there, having no gun, but followed by the pris-
oner with a horse and carriage; shows him between Bruno
Green's and Mrs. Derby's, having no gun; but when he gets
to Mrs. Derby's he has a gun, and the prisoner is ahead of
him instead of behind him as before; and the testimony tended
to show that the gun he had was Hubbard's rifle that the
prisoner borrowed the night before.

The further objection that the testimony has no tendency
to show that the prisoner committed the murder with a
bludgeon, as charged, and cannot be connected with the
alleged intent to commit such a murder,—is not tenable; for
an intent to murder in some way, and an attempt to murder
in a particular way, are evidence of a murder in another way.

One Mattison testified that he was at work on Brandon
mountain that fall, and one day about the middle of the after-
noon, a young man came along with a rifle, which he took and

looked at and handed back to the young man, who went on up the mountain road. The witness could not say whether it was Martel or not. On being shown the Hubbard rifle, the witness said it seemed to him as if it looked like the gun. It is specially objected that this testimony was immaterial and prejudicial. But we think it material as tending to show that Martel was the young man, and as tending to show that it was the afternoon of the day of the expedition over the mountain. The witness's identification of the gun shown him as the one the young man had, though not very positive, was sufficiently so to be admissible, as he gained his impression by actual observation, and in that identification lies the tendency of the testimony indicated.

A witness testified to meeting a stranger near Goshen Corners between half past six and seven o'clock Saturday evening, October 3d, the day of the expedition, and of noticing that he was quite short and walking rapidly towards Brandon. Another testified to meeting a man a little earlier that evening between Crapo's and the Corners, with an unlighted lantern. It is objected that this testimony was too conjectural; that it might or might not have been the prisoner, as to which the jury was at liberty to guess. But we think, taken with the other testimony as to that expedition, it fairly tended to show that it was the prisoner.

The testimony of Lenora Washburn, objected to for the same reason, was entirely unimportant and clearly harmless, and pointed to no time here involved, nor to any other particular time.

The State introduced the testimony of several witnesses in corroboration of Martel's testimony about recrossing the mountain on Sunday, October 4th, the next day after said expedition, drawing his buggy, taking the rifle from the ditch beside the road where he left it the day before, and having a

pistol with him. It is objected that this testimony had no tendency to show complicity between Martel and the prisoner, nor to connect the prisoner with it, and therefore was improperly admitted.

We recognize the rule invoked, that you cannot prove a crime by proving another and a disconnected crime. But if this testimony is to be regarded as tending to show the crime of attempting to commit the crime charged, the rule does not apply, for the attempt is not a separate and disconnected crime, but, as we have seen, is so connected with the crime charged as to be admissible to prove it.

The cases relied upon to show that this testimony was not legally corroborative, are to the effect that to constitute such corroboration of an accomplice as will make it safe for a jury to convict on his testimony, the evidence must tend to confirm his testimony upon a point material to the issue in the sense that it tends to prove the guilt of the prisoner. But they recognize that you may support an accomplice by evidence short of that, the same as you may support any other witness. And this was done in *Commonwealth* v. *Bosworth*, 22 Pick. 397, as explained in *Commonwealth* v. *Holmes*, 127 Mass. 424. *Brown* v. *Welch*, 38 Vt. 241, is illustration of this kind of corroboration. In the case at bar the State did not rely for conviction wholly on the testimony of Martel.

The prisoner having introduced evidence tending to show that Martel was influenced by threats of imprisonment to tell the story he did, it was competent for the State to show that he made similar statements before the alleged threats, about the prisoner's having hired him to kill Root. *State* v. *Flint*, 60 Vt. 304, 14 Atl. 178. Nothing is suggested in argument to distinguish this case from that on this point.

The objection for immateriality to Hubbard's testimony that he saw the prisoner's repeating rifle and revolver when

they were found in the hay in his barn, is not well taken, for the testimony was supportive of evidence admitted without objection and not claimed to have been irrelevant.

It appeared that Root received his death blows in the evening at his horse barn near John Green's house. Peter Green, son of John Green, testified that he saw a man that evening looking in at their kitchen window who he thought was the prisoner, but would not swear positively. The State offered to show an experiment made in the night when there was snow on the ground, with everything arranged in the kitchen as nearly as possible the same as when the witness said he saw the man's face, the result of which was confirmatory of the witness's testimony. The offer was excluded on objection, but the ground of exclusion does not appear. Later in the trial, the prisoner introduced evidence of an experiment the evening of the homicide, when Peter went out and stood by the window, and his mother and brother looked out to see if they could tell him. She said she sat in the same place Peter did, and looked out of the window, and was then asked if she looked "to see if she could tell who it was out there," and answered, "No, sir: I saw some one there, but could not see who it was." Thereupon the State renewed the offer of its experiment, to which the prisoner objected that if any evidence made it admissible it came from Mrs. Green in answer to a question that did not call for it, and that no evidence had been introduced tending to show similarity of conditions outside the house as to light there and other surroundings, nor what the conditions were outside, any further than Mr. Fellows stated. The objection was overruled and the testimony admitted. It does not appear what Mr. Fellows stated. It is contended that the experiment was not illustrative of the condition of the subject-matter at issue in the controversy; that the point made by the prisoner was, that Peter's

unwillingness to swear that it was the prisoner, was because he was not himself perfectly satisfied that it was; that if others might be able under somewhat similar conditions to say positively, it would have no tendency to show that Peter ought to have been able to swear more positively, nor to show that his confidence in what he said ought to have been greater than he testified; that the question was not one of expert testimony, nor directed to proof of any physical conditions that might affect the possibility of seeing; that it was for the jury to weigh the testimony of the witness as his; and that it was not competent to show that other witnesses, if they had been there, might have seen with such clearness as to swear positively whom they saw; and cases are cited in support of the contention.

The State contends that the original transaction was not of such a nature as to render it legally incapable of being the subject of experiment, and that if its essential conditions were reproduced, which must be assumed, the contrary not appearing, the experiment and its result were admissible on principle. But if not, that the prisoner opened the door, and made the testimony admissible as rebutting evidence. And this is manifestly the view the trial court took of the matter, and we think correctly; for it does not appear that the prisoner, in the time of it, disavowed the irresponsive part of Mrs. Green's answer, from which it would seem that he was letting it stand for what it was worth, and the court might well regard the door open for rebuttal.

Although it was not claimed that Martel killed Root, yet he was under such a cloud that it was material for the State to guard against such a claim by showing that he was where he could not have killed him; for every reasonable hypothesis except that of the guilt of the prisoner had to be excluded, and

it would have been legitimate to argue that Martel might have killed him.

The State claimed that Root was killed by blows upon the head with a stake of an old hayrack that the prisoner took from Hubbard's, which, in his flight back to Hubbard's he threw into the bushes beside the road, where it was afterwards found. A piece had been split from the stake when found, and a splinter, found the next morning after the homicide near where it was committed, exactly fitted the stake, thus demonstrating that it was split from the stake. Hubbard testified that he once had an old-fashioned hayrack with bedpieces, raves, and stakes, and described how the raves were held up by the stakes.

Another stake was introduced in evidence, numbered 21, concerning which another witness testified that in November, 1903, he saw under Hubbard's carriage shed the raves of an old hayrack with holes bored through them, evidently to set down onto stakes; that he measured the holes the Sunday before he testified, and last saw stake 21 at Hubbard's that day. To the admission of the testimony of this witness, and the introduction of said stake in evidence, the prisoner excepted. The prisoner introduced evidence of the finding of other stakes, at other places in the vicinity, but it did not appear whether those stakes were similar or dissimilar to the one found beside the road.

In support of said exception it is argued that there was no evidence to connect the prisoner with stake 21, nor to show that he had any knowledge of its existence, and consequently that both it and the testimony concerning it were inadmissible. But the question is not whether the evidence connected the prisoner with that stake, nor whether he knew of its existence, but whether that stake connected the prisoner with

the other stake by tending to show that it came from Hubbard's; and that it did thus tend, is not questioned.

The prisoner claimed, and his evidence tended to show, that Root's death was accidental. At the close of the charge, his counsel suggested that it did not sufficiently explain that in considering whether the death was accidental or not, the prisoner was not obliged to show how it might have happened, but if from evidence of facts that existed, or were shown by the evidence to exist, the jury should be satisfied in their own judgment, regardless of the prisoner's theories, that there was a reasonable doubt whether it was accidental or not, the prisoner was entitled to acquittal. The court said it thought it had exactly covered that point, and refused to charge further, and the prisoner excepted to what was not complied with in accordance with the suggestion.

It is contended that the charge was erroneous in that it limited the jury to a consideration of the matter solely as presented by the arguments of counsel based upon the evidence, whereas the suggestion ought to have been complied with; that the charge expressly put the question thus: "If you consider that the theory of an accidental death cannot reasonably be entertained upon this evidence," whereas it should have been, and if the charge had been qualified as suggested, would have been, put thus: "If upon this evidence you are satisfied that there is no reasonable doubt that the death was not accidental but the work of design."

But if the charge is to be regarded as limiting the jury as claimed, no error appears, for it does not appear but that counsel presented the matter in every view warranted by the evidence. But we do not think the charge, when taken as a whole, did limit the jury as claimed, but left them to an independent consideration of the matter upon the evidence, and that they must have so understood it.

The objection to the way the question was put to the jury is based upon part of a sentence taken from the charge, which, when taken with the rest of the sentence, and with the rest of the short paragraph of which it is a part, is substantially what it is claimed it ought to have been. The paragraph is this: "If you fail to find that Root's death was due to human agency, that will end the case in favor of the prisoner. But if you consider that the theory of accidental death cannot reasonably be entertained on this evidence, there remains the question whether the prisoner inflicted the injuries." The court had already instructed the jury as to the burden of proof resting on the State, and the necessity of establishing the offence beyond a reasonable doubt, and told them that the evidence being entirely circumstantial, it must be such as to exclude every reasonable theory consistent with the prisoner's innocence; that that was but another statement of the rule that the offence must be established beyond a reasonable doubt, for if there remained a reasonable ground on which the killing could be accounted for without the agency of the prisoner, it could not be said that his guilt was established beyond a reasonable doubt.

*Judgment that there is no error in the proceedings of the county court; that the respondent take nothing by his exceptions; and that execution of the judgment and sentence be done.*