STATE *v.* ALBERT BOUDREAU.

October Term, 1940.

Present: MOULTON, C. J., SHERBURNE, BUTTLES, STURTEVANT and JEFFORDS, JJ.

Opinion filed November 6, 1940.

354

*Maxwell L. Baton,* State's Attorney, for the State.

*Hubert Wells* and *Hubert S. Pierce* for the respondent.

JEFFORDS, J. The respondent was charged with burglary and larceny. At the close of the State's evidence a motion was made for a directed verdict of not guilty on the ground that there was no evidence in the case to warrant a conviction on either charge. This motion was granted and the case is here on exceptions by the State.

The material facts as disclosed by the evidence are as follows: The store of W. E. Brock, located in Troy, was broken into on the night of December 17, 1939, and merchandise and money was stolen. About two weeks later one Blanchard came to Sanville, a constable, and confessed to the crime and implicated one Lafreniere in its commission. Blanchard told the constable that part of the stolen goods were concealed at the house of the respondent and told the officer where they could be found. Sanville and Brock then went to the house of the respondent and finding him home asked if he had any objection to them looking over the place to see what they could find. He told them to go ahead and "look all you are amind to." The stolen goods were found in a hole off from a back chamber. The entrance to the space was concealed by sap buckets.

Blanchard was lodged in jail. Lafreniere was apprehended as his home in Rhode Island and brought back to this State and placed in jail with Blanchard. Both gave signed statements involving the respondent in the burglary and larceny and he was arrested and placed in confinement with the other two.

At the trial the first witness called was Brock who testified concerning the articles that were stolen and their value and as to the finding of a part of the same in a box which had been in his store on the night in question.

The next witness was Blanchard whose testimony in substance was that he had worked off and on for the respondent for several years prior to the burglary and was working for and staying at the respondent's home at the time of the same. That

Lafreniere and he had talked several times about breaking into the Brock store. On the evening of December 17, respondent and his wife, Lafreniere and Blanchard drove in respondent's car to visit one Cantell. They returned to respondent's house at about 10:30 and all of them retired for the night. Blanchard and Lafreniere laid down on their bed for a short time then got up and went out of the house and took respondent's car which was pushed for a short distance so as not to awaken respondent. Blanchard then drove the car to a place near the store which they broke into about midnight and then returned to respondent's house and concealed their loot in the place where part of it was later found. He told about the equal division of the stolen goods between himself and Lafreniere and about the burning of some in the furnace at respondent's house one night when Lafreniere and he were there alone. He denied that the respondent had any part in the breaking.

Blanchard also testified that he gave himself up to the officer the day that he had taken respondent's car without permission and had broken it.

It appeared from his testimony that while in jail he had given to the state's attorney a written statement which implicated respondent in the burglary. This statement was introduced by the State for the limited purpose of impeaching Blanchard who testified that it had been given after a motor vehicle inspector had told him that the respondent had reported him (Blanchard) for stealing respondent's car. Blanchard on the stand denied that the parts in this statement implicating respondent were true and said that he had told the state's attorney to change it.

Lafreniere was called by the State and testified that he had been working for and living with respondent for about six months prior to December 17. His story about what happened on that night was in substantial agreement with Blanchard's and he exonerated the respondent from any connection with the affair. Lafreniere left for Rhode Island on a night train four days after the burglary taking his share of what remained of the loot with him. He hired respondent to drive him to Orleans to take the train and Blanchard went with them. He also testified to the burning of some of the stolen goods, placing the time of the burning a little different from that given by Blanchard.

Lafreniere endorsed Blanchard's written statement implicating respondent as stating the truth and this written endorsement was also introduced by the State for the purpose of impeaching Lafreniere.

The next two witnesses were Harold Sanville and Solon Gray, the sheriff of the county. Each of them testified to conversations they had with the respondent. Without rehearsing their testimony it is sufficient to say that none had any tendency to connect the respondent with the burglary or larceny.

The last witness called by the State was one Bourassa who was being held in the jail awaiting deportation charges by the government at the same time Blanchard, Lafreniere and the respondent were there and who testified to certain conversations carried on in French that he overheard between these three. The State claims that these conversations afforded sufficient evidence to go to the jury on the question of respondent's guilt in that they disclosed: (a), the respondent suggested to Blanchard that he (Blanchard) fabricate evidence about pushing the truck out of respondent's yard so as to clear the respondent, (b), a statement of respondent in regard to concealing a suit case indicated his participation in the burglary, (c), the respondent threatened a witness, (d), he offered a reward to Blanchard and Lafreniere if they would take all the blame, and (e), respondent contemplated escape from jail.

Some difficulty is encountered in ascertaining just what Bourassa heard in regard to the conversations relating to the pushing of the truck and especially as to who said what and to whom, due to his apparent difficulty in expressing himself in English. The following is the substance of these conversations as nearly as can be determined: Blanchard told Boudreau that it wasn't Blanchard's fault if Boudreau was in jail. That Blanchard said the officer told him lies and that he (Blanchard) and Lafreniere framed up Boudreau by telling that he was with Blanchard in the commission of the crime. That Blanchard told Boudreau that the officer had lied to Blanchard and that was why he (Blanchard) had pulled Boudreau into it. Blanchard told Boudreau at first that Boudreau was not in the mix-up, that he (Blanchard) took the truck and pushed it down to the sand pit and started the truck. The witness was then interrupted by the state's attorney who asked him to tell what he heard Boud-

reau say to Blanchard and Lafreniere about them saying that they pushed the truck so that Boudreau wouldn't hear it. The witness then continued as follows: Boudreau said to the boys that he didn't say anything, and to tell that they took the truck and pushed it to the sand pit and started it so that he (Boudreau) would not be in mix-up, that he had a family and he didn't want anything to do with it, that if the boys were caught it wasn't his fault, to say they pushed the truck so as not to wake him up. Blanchard was the first to mention anything about pushing the truck. Blanchard told Boudreau that he (Blanchard) was going to tell that they (Blanchard and Lafreniere) pushed the truck to the sand pit so that Boudreau wouldn't be mixed up. Boudreau then told Blanchard to say that. Blanchard said that Boudreau was mad at him because he (Blanchard) got Boudreau into the mix-up. Boudreau said about the night "they make that break in Brock's store to not mention it—that he wasn't there—that they took the truck themselves to the back of the place." Boudreau in his talk about pushing the truck did not say anything about pushing it to the gravel pit. As the witness understood it, Blanchard told Boudreau that he (Blanchard) was going to say that to clear Boudreau from the case and Boudreau said in response that "is all right."

In cross examination this witness again testified that Blanchard was the first one to speak about pushing the truck and that he (Blanchard) said "we are going to tell him that we push that truck on the sand pit so you didn't hear start it."

On re-direct examination the last question on this subject matter was put by the state's attorney, which, with the answer, follows:

"Q. Just before Blanchard made this remark about they were going to say they pushed the truck down to the sand pit to get it started, what if anything did he say about being sorry that he had got Boudreau in trouble?
A. He says to Boudreau, he says 'I am sorry' he says 'that you are in the mix-up because' he says 'you was good to us.'"

The testimony relating to the conversation regarding the suit case was as follows:

"Q. Go ahead.

A. And he ask him where the suit case was that he hide in his room, in Blanchard's room.

Mr. Pierce: That isn't plain to any one.

The Court: Who asked where the suit case was?

A. Blanchard asked Boudreau.

Q. Asked Boudreau?

A. That is, who took the suit case in his room, in Blanchard's room.

Q. All right. Go ahead.

A. And he says, 'well', he says, 'I hide it good, nobody can find it.'

Q. Who said that?

A. Boudreau.

The Court: Now can't you, as you tell this, Mr. Witness, use their names, Boudreau's, as you go along instead of saying 'he said this' and 'he said that,' use the names as you give us the story, say which one said this and which one said that.

Q. Now go ahead, Mr. Witness.

A. Blanchard asked him if Pete went and got it.

Q. Pete?

A. Pete, yes. So I don't know that he did answer on that. It was noisy at that time."

On cross examination the following:

"Q. Now you gave some evidence here about a suit case. Did you find out who owned this suit case?

A. No, I didn't find out who owned the suit case.

Q. You didn't. You don't know whether it belonged to Blanchard or Lafreniere?

A. Well, in one way I think it did belong to Blanchard because he said that he had it in his room.

Q. That is Blanchard's room?

A. Yes."

On re-direct:

"Q. Did Blanchard by any chance say what was in this suit case that you have testified about?

A. Well, cigarette, Chesterfield cigarette, cigar, I don't know, there was some other kind of cigarette, but he says Chesterfield and cigar.''

The following is the testimony as to the threats:

''Q. Now what if anything did Boudreau say to you in the way of threats, after he found out you could understand and talk French?
A. Well when you (the state's attorney) call me in the office on Monday, the 8th, after I came back Blanchard asked me if I squeal. I told him no. So he asked Blanchard the same question and Blanchard tell them I didn't squeal and he told to Blanchard I had better not to.
Q. Told Blanchard you had better not?
A. No.''

The testimony as to the offer of a reward:

''Q. What did Boudreau say to the boys, if anything, about they ought not to put him in the mixup?
A. He says he would pay them.
Q. But tell, as near as you can, Mr. Bourassa, what it was Boudreau said? I mean give his words as near as you can, what did he tell the boys?
A. Well, when he see that he was in the mix-up he says to Blanchard and Blackie (Lafreniere) that they shouldn't put him in the mix-up, that he done all he can for them and he would reward them, you know, by paying them—get them off.
Q. And did he say what form this reward or pay would be?
A. No. * * *
Q. Well, you said something here in response to the state's attorney's questions, about Boudreau saying something about rewarding them. When did that take place?
A. Well, this was taking place, you know, when he says, he told Blanchard not to get him in the

mix-up and Blanchard not to squeal about the fire, or keep that about the fire under their hat, he says 'if you don't put me in the mix-up,' he says, 'I will reward you.' ''

The testimony as to escape:

"Q. Oh, I see. And what was said between you and Blanchard and Blackie wasn't loud enough so Boudreau could hear it?
A. No only about that they tried, you know, Blanchard told about Blackie, you know, tried to escape and then he asked if they would be willing to do it too.
Mr. Pierce: I think that we should find out—I ask to have that struck out.
The Court: Well, perhaps it should, Mr. Pierce. I am going to ask a question so as to make sure to clear it up.
Q. Who asked if they would be willing to do it too?
A. Blanchard talking to Boudreau, if he was willing to join anything. He says 'if we get a heavy sentence we will run away.'
Q. You say that Blanchard asked Boudreau if he would be willing?
A. Yes, to run away with them.
Q. Run away with them?
A. Yes.
Q. What did Boudreau say to that?
A. Well he says, 'yes,' he says, 'if we have a heavy sentence.' ''

In determining whether the lower court was correct in directing the verdict, the evidence must be taken in the light most favorable to the State. *State* v. *Woolley,* 109 Vt. 53, 63, 192 Atl. 1; *State* v. *Foss,* 110 Vt. 453, 8 Atl. 2d. 649. But, since all the evidence relied upon by the State to show that the respondent was guilty of the crimes charged was circumstantial, it was incumbent upon the State to produce evidence of circumstances which excluded every reasonable hypothesis excepting that the respondent is guilty. *State* v. *Foss, supra,* and

cases cited therein. Or to put it differently, such evidence must be such as to exclude every reasonable theory consistent with the respondent's innocence. *State* v. *Bean,* 77 Vt. 384, 403, 60 Atl. 807. Mere suspicion, however strong, will not supply the place of evidence. *State* v. *Foss, supra.*

With these rules in mind we will turn to the question of whether the State introduced evidence fairly and reasonably tending to show respondent's guilt, or in other words whether the jury on the evidence would have been justified in finding the respondent guilty beyond a reasonable doubt. These are the tests laid down in passing on a motion for a directed verdict such as the one made here. *State* v. *Woolley, supra; State* v. *Foss, supra.* Although "fairly and reasonably," has come to be, with us, the orthodox form of expression, *Wellman, Admr.* v. *Wales,* 98 Vt. 437, 448, 129 Atl. 317, another form used on such motions is that there must be *substantial* evidence to make a case for the jury. See *Wellman, Admr.,* v. *Wales, supra,* at 447, and cases cited therein. The evidence also must be of such quality and character as to justify a jury, acting reasonably, to predicate a verdict thereon in favor of the party having the burden of proof. *Wellman, Admr.,* v. *Wales, supra; Perkins* v. *Vt. Hydro-Electric Corp.,* 106 Vt. 367, 399, 177 Atl. 631.

The State claims that the fact that a part of the stolen goods were found in respondent's home is evidence of his guilt of the crimes charged on the theory that the unexplained possession of stolen property is evidence of the fact that the possessor was guilty of larceny of the same and it cites *State* v. *Brewster,* 7 Vt. 118, and *State* v. *Bishop,* 51 Vt. 287, 31 Am. Rep. 690, in support of its contention. These cases are of no help to the State as we shall show later.

The rule that mere constructive possession of stolen goods is not sufficient to make evidence of guilt on the part of the possessor but that it is necessary that such possession must be personal and exclusive and to the knowledge of the possessor is well set forth in 17 Ruling Case Law page 73, Sec. 77, as follows: "The general rule that the possession of stolen property is evidence of guilt is limited by the rule that to warrant an inference of guilt it must further appear that the possession was personal, and that it involved a distinct and conscious assertion of possession by the accused. It would be pushing the rule too

far to require of one accused of a crime an explanation of his possession of the stolen property, when such possession could also, with equal right, be attributed to another. Hence the mere fact of finding stolen articles on the premises of a man of a family or in a place in which many others have free access without showing his actual conscious possession thereof discloses only a *prima facie* constructive possession and is not such a possession as will justify an inference of guilt by reason thereof.'' See also to the same effect: *State* v. *Sullivan,* 34 Idaho 68, 199 Pac. 647, 17 A. L. R. 902; *People* v. *Hurley,* 60 Cal. 74, 44 Am. Rep. 55; *State* v. *Drew,* 179 Mo. 315, 78 S. W. 594, 101 Am. St. Rep. 474; *State* v. *Wilks,* 58 Mo. App. 159; *State* v. *Schimmels,* 105 Wash. 151, 177 Pac. 685; Note 101 Am. St. Rep. 474; Underhill, Criminal Evidence, 3rd Ed. Sec. 469.

Here both Blanchard and Lafreniere were living at the home of the respondent and had, as far as the evidence discloses, as free access to the place where the goods were found as did the respondent. It follows, therefore, that the fact that these goods were found in the home of the respondent was no evidence that he was guilty of either the burglary or the larceny herein charged.

In the *Brewster* case, *supra,* it was shown without question that the respondent knew of the place where the stolen goods were concealed. The statement of the Court as to the possession of stolen goods as *prima facie* evidence of guilt though applicable to the case at hand, as far as the requirement of conscious possession is concerned, was not strictly accurate as applied to all cases of this nature.

In the *Bishop* case, *supra,* the charge of the court on this subject matter was conceded to have been accurate as applied to larceny and thus no question was raised on this point for determination.

We have already seen that neither the testimony of witnesses Sanville or Gray had any tendency to show guilt on the part of the respondent and the same is true of the testimony of Brock.

We come then to witnesses Blanchard and Lafreniere. As has been seen they wholly exonerated the respondent. The statements given by them involving the respondent were admitted for impeachment purposes only and these witnesses not being parties to the cause, the statements were not evidence of the facts

therein stated. *Robinson* v. *Leonard,* 100 Vt. 1, 5, 134 Atl. 706. The State attempts to make something from the testimony of these two relating to the quantity of certain articles taken and their division as tending to show that a third person must have participated in the spoils and also because of the fact that respondent drove Lafreniere a greater distance than was necessary in order for him to take a train. None of this evidence, however, tended to connect respondent with the crimes charged.

The State must rely then, as it does largely, on the testimony of Bourassa for the required evidence to take the case to the jury. We will discuss this testimony in the order that we have reviewed it and as applying to the points claimed for it by the State.

It appears that the testimony in regard to the pushing of the truck tends to show that Blanchard told Boudreau that they had framed him up because of the lies told Blanchard by the officer in regard to the complaint by Boudreau relating to the stealing of the truck. That Blanchard said that he took the truck and pushed it down to the pit and that Boudreau was not in the ''mix-up'' and he was sorry that they had got him into it and he was now going to tell that he and Lafreniere pushed the truck so as to clear Boudreau. That the respondent said, ''that is all right,'' I have a family and I do not want to be in the mix-up.

 If this be the correct interpretation of what Bourassa testified to in this respect it, of course, has no tendency to connect the respondent with the crimes charged. But if it be considered that in drawing this conclusion we have not viewed the evidence in the light most favorable to the State it still appears to us that the evidence on this matter was not of sufficient character, standing alone, as to warrant a jury, acting reasonably, to predicate a verdict of guilty thereon. It lacks the necessary substance.

 The State claims that the evidence in regard to the concealing of the suit case showed that the respondent assisted and participated in the burglary because some of the stolen goods were contained in the .suit case. It it true that there was evidence that some Chesterfield cigarettes were stolen and some cigars and it might be inferred that some of them were in the suit case. There is no evidence, however, that the respondent

knew the contents of the suit case and it was not one of the articles stolen. If this concealment could be considered as evidence of any crime committed by the respondent it is not evidence of any for which he could have been found guilty under the charges for which he was on trial.

The evidence as to threats is wholly wanting in substance. It should first be noticed that the witness answered "no" when finally asked if respondent had told Blanchard that he (Blanchard) had better not "squeal." If what was said can properly be called a threat within such word's necessary meaning here it does not appear as to whether the apprehended "squealing" applied to something relating to Blanchard or to the respondent and no privity is shown between Blanchard and respondent.

The evidence as to the claimed offer of reward also is wholly lacking in the necessary substantial character. No definite offer of anything is made.

The evidence as to escape falls into the same class as the two preceding. Here was no escape, nor attempt to escape, but a mere expression of willingness upon a certain condition. This statement was equally consistent with the innocence of the respondent as with his guilt of the crime charged.

We have examined other evidence in the case brought to our attention by the State but none was of the required character to warrant a conviction. It may be that the evidence raises a suspicion and possibly a strong one that the respondent was involved in the crimes charged. But as we have said before, mere suspicion, however strong, will not supply the place of evidence.

*Judgment affirmed.*